Rice *et al. v.* Gong Lum *et al.**

(In Banc. May 11, 1925.)

[104 So. 105. No. 24773.]

1. Schools and School Districts. *Person of Mongolian race is not entitled to attend school for white persons; "colored races," "white race."*

Under section 207 of the Constitution of 1890, providing that there shall be separate schools for the white and colored races, the term "white race" as used therein is limited to the Caucasian race, and the term "colored races" is used in contradistinction to the white race, and embraces all other races.

2. Schools and School Districts. *Purpose of Constitution providing for separation of races was to preserve purity and integrity of white race.*

The dominant purpose of the Constitution in providing for separation of the races was to preserve the purity and integrity of the

white race and prevent amalgamation, and to preserve, as far as possible, the social systems of race segregation.

3. SCHOOLS AND SCHOOL DISTRICTS. *Each county is divided into school districts for each race separately.*

Under the statutes of the state the whole territory of a county is divided into school districts for each race separately, the whole county being divided into school districts for the white race, and the whole county being divided separately into school districts for the colored races, and each child in the county lives in a district where a public school is maintained for the race entitled to attend the school, within convenient distance of each child.

4. SCHOOLS AND SCHOOL DISTRICTS. *"Consolidated school" defined; consolidation of school district is discretionary with school authorities; either consolidated school or common school district may extend terms and conduct high school curriculum and levy taxes to support extended terms.*

A consolidated school is simply a common school conducted as other common schools are, made up of the consolidation of two or more previous school districts consolidated into one. Such consolidation is discretionary with the school authorities. A consolidated school and the common schools are the same in effect, and either district may, under given conditions, extend the terms and conduct a high school curriculum therein, and may levy taxes to support such extended terms, there being no discrimination between the races therein in reference thereto.

*Headnotes 1. Schools and School Districts, 35 Cyc., p. 819; As to who is a negro, mulatto, or person or color within statute not specifically defining the same, see notes in 31 L. R. A. (N. S.) 180, L. R. A. 1915A, 828; 24 R. C. L., pp. 655-657; 2. Schools and School Districts, 35 Cyc., p. 819; 3. Schools and School Districts, 35 Cyc., p. 819; 4. Schools and School Districts, 35 Cyc., pp. 849, 850.

APPEAL from circuit court of Bolivar county, First District.

HON. W. A. ALCORN, JR., Judge.

Suit by Gong Lum and another by next friend Chew How, for mandamus to be directed to G. P. Rice and others. From judgment for plaintiffs, defendants appeal. Reversed, and petition dismissed.

*E. C. Sharp,* Assistant Attorney-General, for appellant.

Gong Lum filed a petition in the circuit court of Bolivar county for a writ of mandamus to compel the state superintendent of education, the county superintendent of education and the trustees of the school in Bolivar county to admit Chinese children to the white schools of the county, to which a demurrer was interposed by the attorney-general and the case heard in vacation by agreement, the demurrer being overruled by the trial judge and this appeal prosecuted.

The issue presented by this case calls for a construction of section 207 of the Constitution of Mississippi, which is as follows: ''Separate schools shall be main- tained for children of the white and colored races.''

And section 1 of article 14 of the Constitution of the United States which reads as follows: ''All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.''

If children of Chinese birth are of the white race, the court was correct in overruling the demurrer in this case, otherwise it should have been sustained.

The action of the school authorities in denying Chinese children admission to the public schools organized and conducted for children of the white race was based upon an opinion rendered by the attorney-general of Mississippi on the 13th day of September, 1924, which opinion followed one rendered by the same office on the 13th day of February, 1920. Both of the said opinions cited the case of *Moreau et al.* v. *Grandich et al.*, 114 Miss. 560, 75 So. 434.

In the *Moreau case, supra,* the children were of negro descent, and it may be contended that, therefore, the rule

therein set forth is not applicable to children of Chinese descent. This however, is answered by the fact that the court in the Moreau case adopted the language used by the supreme court of the United States in many cases, in which that court defined "white" as applied to races.

And in almost, if not every instance, in which the supreme court of the United States has been called upon to pass upon the eligibility of aliens to become naturalized under these provisions, it is held that only members of the Caucasian race were eligible as free white persons.

The definition of "white" or the rule as to who were intended or included in the term "white race," was first announced so far as we are able to ascertain in 1878 in the case of *Ah Yup,* 5 Sawy. 155, Fed. Cas. 140, and has been constantly followed and adhered to by that court and practically all of the state courts since that time. The most recent decisions of the court on that subject are in the cases of *Ozawa* v. *U. S.,* 260 U. S. 178, 67 L. Ed. 199, and *Yamashita* v. *Hinkle,* 260 U. S. 198, 67 L. Ed. 209.

In the Yamashita case, Chief Justice RAEVIS of the supreme court of Washington in 30 Wash. 234, discusses the divisions of the human race and adopts that of Blumenbach, which is that adopted by Webster in his Dictionary.

It has been at all times the policy of the lawmakers of Mississippi to preserve the white schools for members of the Caucasian race alone. Following the separation of the races authorized by the Constitution, by section 4562, Code of 1906, it is provided that county school boards may locate schools exclusively for Indians. Our lawmakers evidently had in mind the fact that Indians cannot be classed as of the Caucasian or white race and were desirous of prohibiting an intermingling of any race with the Caucasian or white children of our state. See 7 Cyc. 167.

In *Plessy* v. *Ferguson,* 163 U. S. 537, the constitutionality of the Louisiana statute, requiring separate coaches

for the races was involved.   See, also, *Cory* v. *Carter,* 48 Ind. 327, 17 Am. Rep. 738; *Cumming* v. *Board of Education,* 175 U. S. 528, 44 U. S. (L. Ed.) 262.

While all admit that the benefits and burdens of public taxation must be shared by citizens without discrimination against any class on account of their race, the education of the people in schools maintained by state taxation is a matter belonging to the respective states, and any interference on the part of Federal authority with the management of such schools cannot be justified except in a case of clear and unmistakable disregard of rights secured by the supreme law of the land.

Inasmuch as the right of the state to require separate schools for the white and colored races had been upheld in numerous cases, and there being no allegation in the original bill that adequate schools are not being maintained for children of the colored races, we come back to the question, and really the only question, involved in this case, to-wit: Are Chinese children of the white race and entitled as such to attend the schools of the white race.   " 'White persons,' as used in the Constitution and statutes, 'has a distinct signification, which *ex vi termini* excludes black, yellow, and all other colors.'   It is used, 'in its generic sense, as including the Caucasian race, and necessarily excluding all others.' "   Webster's International Dictionary, Words & Phrases, Vol. 8, 7446; *People* v. *Hall,* 4 Cal. 399; *In Re Kanaka Nian,* 21 Pac. 993, 6 Utah 259, 4 L. R. A. 726; 40 Cyc. 927.

However, we do not have to look to the cases of other states, or the classifications of other courts to determine the legislative classification of the Chinese or Mongolian race in Mississippi.   The *status* or classification of this race has been declared and fixed by our own legislature. It has in unmistakable terms placed the Chinese or Mongolian race in the same category with the negro.   This is conclusively shown by section 2551, Hemingway's Code, being section 3244, Code 1906.

The above section is identical with section 2859, Code 1892, which code was adopted two years after the adop-

tion of our present Constitution, and no doubt many of the members of the legislature at the time of the enactment of this statute had been members of the Constitutional Contention, which by section 207 of the Constitution of Mississippi declared the policy of the state of Mississippi in regard to the separation of races in the schools.

It was argued in the lower court and doubtless will be in this court that at the time of the adoption of the Constitution of 1890 the framers of the Constitution only had in mind the white and negro races. We cannot accept this reasoning, for as is well known, the Constitutional Convention included among its members many of the most able lawyers that the state of Mississippi has ever produced and they were no doubt familiar with the classifications which had been put upon the races by the supreme court of the United States, and which classification was adopted many years prior to the adoption of our own Constitution. For as early as 1878 the supreme court of the United States had held that only members of the Caucasian race were entitled to be classified as white persons.

We call the court's attention to the case of *Lehew* v. *Brummell,* 23 Am. St. Rep. 895, 103 Mo. 546, 15 S. W. 765, in which the construction of section 1 of the Fourteenth Amendment to the Constitution of the United States was involved. We, therefore, submit that the demurrer should be sustained and that the judgment of the lower court should be reversed and judgment entered here, overruling the demurrer.

*Flowers, Brown & Hester* and *Brewer, Brewer & McGehee,* for appellees.

The demurrer admits that Martha Lum is a citizen of the United States and of the state of Mississippi and a resident of Rosedale consolidated school district, that she is a child within school age, that she is otherwise eligible; that no separate school is provided in that dis-

trict or county for Chinese children; that she is not a "colored child" within the meaning of our Constitution and laws; that she is denied admission to the school at which she presented herself solely on the ground that she is a Chinese child.

There is no contention by opposing counsel that Martha Lum should attend a negro school. It is conceded that she is not of the race whose presence in the south occasioned the Constitutional and statutory provisions for separate schools. The requirement in the Constitution of 1890 that separate schools must be maintained for the races dealt with only two races. The purpose was to make it certain that negro children should not attend the same school with white children. The provision was intended to meet a peculiar condition, to solve a local problem. The race to be separately provided for under the mandate of section 207 of the Constitution of 1890 was and is the negro race.

Section 201 of the Constitution is general in its nature, was designed for all colors and races. A uniform system of free public schools must be established "for all children between the ages of five and twenty-one years." The public school system is a state institution and is supported by taxation. All children are to be provided for, all have equal rights. This section 201 committing the state to the policy of promoting intellectual, scientific and moral improvement is in line with the government's promise in accepting the Georgia Cession to follow in the new territory the public policy notably proposed in the Ordinance of 1787.

The state collects from all for the benefit of all. The state undertakes to educate its children and it exacts of all persons who own property a contribution to the common fund. Martha Lum is one of the state's children and is entitled to the enjoyment of the privilege of the public school system without regard to her race.

Section 201 proclaims the policy. It is all-embracing. It is bigger than section 207. It embraces section 207.

At least the support of the policy ordained by section 201 is not limited nor the policy itself changed or limited by section 207. The legislature under section 201 must provide a system of free public schools for all children although under section 207 it must provide separate schools for the white and colored races. If section 207 should be construed to mean that only children of the Caucasian race can attend the white school and that only children of the African race can attend the colored school and that these are all the schools required to be maintained, then section 207 would be a limitation upon the policy declared in section 201 and would write into section 201 after the word "children" the words "of the white and colored races." This would mean that when a school of Caucasian children and a school for African children has been provided, the legislative duty has been performed. If there are other races no provision is made for them. They are citizens but not entitled to the privileges of citizens. They pay their taxes and have children of school age but their contributions must go to the children of Caucasian and African races for whom schools are separately provided. This would result in a discrimination intended by nobody. We have no law denying citizenship in this state to Chinese and Japanese. We make no discrimination in favor of any nor against any race. All are received as citizens and treated as such as long as they obey the laws.

We maintain no school except white and colored. It is not necessary to mention the statute, section 7378 of Hemingway's Code, which authorizes the county school board to locate a special school for Indian children. This can only be done in counties where there are Indian children sufficient in number to form a school. There is no provision for Indian children in other communities unless they may attend the white or the colored school. And it would never be held that they are colored children within the meaning of our laws.

Section 207 does not require the establishment of schools exclusively for white children and other schools

exclusively for colored children. It only requires that separate schools for white and colored children shall be maintained. It was intended to say that white children should not attend colored schools and colored children should not be allowed to attend white schools. The purpose was to separate the white and colored children. The historical setting gives it this meaning; physical differences and the social relations suggest this purpose.

Other races were not dealt with by the Constitution. The dominant and only question of the kind was dealt with by section 207. Its requirements are met when schools are established under such regulations as separate the children of the white and colored races. The statute allowing the organization of separate schools for Indian children in certain instances recognizes that there are other instances where separate schools for Indian children do not have to be maintained. Indian children who are citizens of the state of Mississippi and of the United States have the same right to share in the public school fund that white children possess. And they have this right without regard to the number of them that may be in any school district. The legislature in authorizing the establishment of separate schools for them where there might be a sufficient number of them in any district, recognizes their right and assumes that they are already provided for in other instances, that is, where they are not in sufficient numbers in a district to warrant the organization for them of a separate school.

Chapter 260, Laws 1918, also recognizes the fact that perhaps in some localities it might be wise to locate and establish schools for not only Indians but for the members of other races than white and colored, and, therefore, provides under certain circumstances for the establishment and location of schools for Indians or other races.

Section 201 of the Constitution is mandatory in that free public schools for all children must be established. Section 207 provides that "separate schools shall be

maintained for children of the white and colored races."
These two sections must be construed together and may
be harmonized.

If section 207 were a section of exclusion, and not one
of classification, then clearly a Chinaman, who is a mem-
ber of the Mongolian or yellow race, would be excluded
from the free school and deprived of his constitutional
rights vouchsafed him by section 201, and also by the
last clause of the Fourteenth Amendment to the Consti-
tution of the United States, which prohibits a state from
denying to any person within its jurisdiction the equal
protection of the law and from depriving him of his
property without due process of law.  In order to har-
monize these two sections it becomes absolutely essential
to construe section 207 as one of classification, making
these two general classifications of schools, one of which
any educable child of the state is entitled to attend,
whether that child be white, black, brown, red or yellow.

A case which ably discusses the question of classifica-
tion and shows that section 207 is one of classification, is
*Van Camp* v. *Board of Education,* 9 Ohio State, 406.
That these appellees are citizens both of the United
States and of the state of Mississippi, we do not under-
stand to be controverted by the learned attorney-general.
We therefore, upon this question, content ourselves with
citing *Wong Kim Ark* v. *United States,* 169 U. S. 649, 42
L. Ed. 890.

The brief of attorney-general assumes that section 207
is one of exclusion and he directs his learning to a cita-
tion of authorities to the effect that a Chinaman is not
a Caucasian.  We cheerfully admit this fact.  A China-
man is a Mongolian.  He cites Federal court cases and
decisions of the supreme court of the United States
dealing with the naturalization laws, wherein that court
holds that white persons under the law are members of
the Caucasian race and that a Chinaman and a Japanese
are members of the Mongolian or yellow race and are
therefore not entitled to become naturalized citizens of
this country.

He could also have gone further and shown that under the decisions of the United States both Federal and state, the term "colored race," "colored person," or "person of color," has acquired a distinctive meaning in these United States and simply mean one who has an appreciable amount of negro blood in his veins. By applying this doctrine of exclusion we shall show that the Chinaman is not a member of the colored race, nor a colored person, nor a person of color, and therefore cannot attend the schools for the colored race.

These interchangeable, distinctive terms acquired this meaning because of the history of this country beginning in colonial days with the importation of the African or black person into this country as slaves. For a long period of time the inhabitants of the country were the white people or Caucasians and the negroes or Africans. The Caucasians were the dominant race. The negroes were slaves. In the course of time the abolition movement was begun, lots of slaves were voluntarily given their freedom. The freedom of some were purchased. Certain states became free states. The friends of abolition and the freed men objected to the word "negro." They preferred the use of the words "colored person." The slave-holding states did not particularly object to the use of the term "colored person," and the use of this term to denominate negroes or those with mixed blood, or partly negro blood, was engrafted into a great many of the statutes of the various states, as well as the opinions of the courts of the different states, and the meaning uniformly applied to the term "colored person" is, one with negro blood.

In the opinion of the court in *Herrin* v. *Bridault*, 37 Miss. 209 at 221, it is said: "That the legatee under the will purported to dispose of his whole estate, was a 'free woman of color,' we think beyond doubt, from the evidence in the record. And that, by the description of 'free woman of color,' is to be understood one of the African descent, we think equally clear, from the fre-

quent use of the same or similar language, by both the legislative and judicial departments of our state and National Governments, as synonymous with 'free negro.'"

In *Crisman* v. *Brookhaven*, 70 Miss. 477, the act, among other things, provided for the erection of public schools for white and colored children. In his opinion, Judge CAMPBELL directly speaks of it as schools for whites and negroes.

In the very able opinion of Judge ETHRIDGE in *Moreau* v. *Grandich*, 114 Miss. 560, it is said: "The word, 'white' defined means 'members of the white or Caucasian race,' and the word, 'colored' means not only negroes but persons who are of the mixed blood. Clearly meaning, of course, persons who have negro blood in their veins." The learned justice then quotes from the case of *Mullins* v. *Belcher*, 104 Ky. 673. The Kentucky court there defines who are colored children and the quotation winds up as follows: "but the question in its final analysis bears on whether or not the person has or has not an appreciable admixture of negro blood." Then follows a quotation from the case of *Lee* v. *R. R. Company*, 125 La. 236. From the Lee case we beg leave to make the following quotation: "The word 'colored' as used in the statute is a term specially applied in the United States to negroes or persons having an admixture of negro blood. See Webster's International Dictionary. The same word is often applied to black people, Africans, or their descendants, mixed or unmixed, and to persons who have any appreciable mixture of African blood."

In *State* v. *Treadway*, 126 La. ——, 52 So. 500, there are given many definitions of the words, "colored persons." We ask the court to read this opinion. See, also, 24 R. C. L., 655, sec. 113. Other interesting cases from different courts conclusively show that "colored person," or "the colored race," refers only to one with more or less negro blood. *Lehew* v. *Brummell*, 103 Mo. 546, 23 Am. St. Rep. 895; *Strauder* v. *State*, 25 L. Ed.

664; *Plessy* v. *Ferguson,* 41 L. Ed. 259; *Cory* v. *Carter,* 17 Am. St. Rep. 760. See, also, 13 Ann. Cas. 344 (note); Ann. Cas. 1912D. 456 (note) Ann. Cas. 1912D, 456 (note); Ann. Cas. 1916C, 796 (note); 31 L. R. A. (N. S.) 180 (note). The court will note that as far back as 5th Cushing (Mass.) in the case of *Robert* v. *Boston,* p. 198, this same definition was applied.

In 1864 Congress passed an act providing for the maintenance of separate free schools for white and colored children in the District of Columbia. A child of negro blood, as was the case in practically every decision we have cited to the court on school questions, wanted to go to the white school. No definition of the word "colored" is given in the act. The opinion of the court of last resort of the District of Columbia, is a very able and interesting opinion. It is more directly in point than any other case that we have been able to find. It discusses the meaning of the word "colored" as used in this act and concludes, just as in all of the other authorities, that it means one having an appreciable amount of negro blood in his or her veins. It quotes from the opinion of the trial judge and it is that quotation to which we want to invite the attention of the court. It is as follows: "That the common use of the word throughout the United States is in nowise significant of mere complexion is quite definitely established by considering the universal habit of the people in their unalterable failure to apply it to the Indian, who is red, the Mongolian, who is yellow, or to the Malay, who is brown. Its application to one of these unfair complexions is not any time to be heard; to those of negro blood alone it is ever found to be suited; and then, not depending for the propriety of its application upon a shade of particular blackness, but rather upon an admixture of a particular blood, the negro." This quotation is taken from 31 L. R. A. (N. S.) 186, in the case of *Wall* v. *Oyster.*

This judge decides just exactly what we think has been decided in practically every southern state in the union

as well as in the northern states, namely, that schools
for colored children are maintained really for the col-
ored children while schools for whites are maintained not
only for whites but for every other race except the col-
ored race.

The state of California, where they have a large popu-
lation of both Chinese and Japanese, now by law pro-
vides for separate schools for the Mongolian, In that
state the negroes and white both attend the same school.
The development of the laws of California along this line
is interesting and is shown in *Tape* v. *Hurley,* 66 Cal.
473, and a case in 119 Fed. 381, and another in 82 Cal.
588.

It will also be noted that the petition in this case al-
leges that the Rosedale consolidated school is the only
school conducted in this district available for her as a
pupil. The demurrer admits this fact, and since she is
entitled to this valuable right or privilege by virtue of
section 201, we submit that on this question alone the
judgment of the lower court must be affirmed.

In *McFarland, Tax Collector,* v. *Goins,* 50 So. 493, this
court dealt with an Act of 1908, authorizing the county
to establish one Agricultural High School for the instruc-
tion of the white youth of the county. Such school would
be supported by taxes levied on all the property of the
county. The collection of the tax was resisted on the
ground that the law denied to the negroes the equal pro-
tection of the law guaranteed to them by the Fourteenth
Amendment. And on that ground this court condemned
the law. The court said: "Civil rights do not mean so-
cial rights, and the courts, both state and Federal, recog-
nizing this, and further realizing that no man-made law
can force this condition of affairs have steadily upheld
all laws that merely had for their object this disassocia-
tion of the two races as promotive of the peace and wel-
fare of all the citizens."

In this case and in the other cited in the opinion there-
in there was dealt with the question of the separation of

the white and colored races. The courts whether deal-, ing with schools, public transportation or theaters find that the purpose aimed at in the statutes is the separation of these two races. Other races may mix in an assembly but these do not mix in the southern states.

All the difficulty is removed and harmony among the statutes and the state and Federal constitutional provisions reigns when we look at section 208 as an organic requirement that colored children shall be required to attend one school and white children another school, that is, as having in mind only the separation of these two races. The two that were to be separated by this section 207 were the white and colored.

It is merely suggested by opposing counsel that the Chinese children should attend the negro schools. But it is clearly shown by the authorities cited herein that the Chinaman is not a "colored person" within the meaning of our laws. He would therefore not go to the negro school as a negro. The court will take judicial notice of the fact that members of the Mongolian race under our Jim Crow statute are treated as not belonging to the negro race. The Japanese are classified with the Chinese. These two races furnish some of the most intelligent and enterprising people. They certainly stand nearer to the white race than they do to the negro race. If the Caucasian is not ready to admit that the representative Mongolian is his equal he is willing to concede that the Mongolian is on the hither side of the half-way line between the Caucasian and African.

Section 207 was put into the Constitution for the specific purpose of placing it beyond the power of the legislature or school authorities to allow colored children to attend school with white children. If it has been intended to separate the others this section might have read "separate schools shall be maintained for children of different races." But it was the prominent racial differences that brought this section into existence. *Peoples* v. *Gallagher,* 93 N. Y. 438, 450, 45 Am. R. 232;

*Johnson* v. *Board* (N. C.), 82 S. E. 832, L. R. A. 1915 A., 828.

We wish to be understood as not insisting that to exclude a Chinese citizen child from the public schools violates that clause of the Fourteenth Amendment protecting the privileges and immunities of citizens of the United States. Our contention is that to thus exclude the Chinese child is to do a thing prohibited by the last clause of the Fourteenth Amendment. *Ward* v. *Flood* (Cal.), 17 Am Rep. 417; *Wysinger* v. *Crookshank,* 82 Cal. 588; 11 C. J. 805, 806; 24 R. C. L. 653.

Argued orally by *E. C. Sharp,* Assistant Attorney-General, for appellants, and *Earl Brewer,* for appellees.

ETHRIDGE, J., delivered the opinion of the court.

The appellees were plaintiffs in the court below and filed a petition for a mandamus against the trustees of a consolidated public school for the white race in Bolivar county, Miss., known as the Rosedale consolidated school, and situated at Rosedale in Bolivar county, Miss., against the county superintendent of education, and against the state superintendent of education, to compel said trustees and said county and state superintendents of education to admit Martha Lum, a minor of school age, of pure Chinese and Mongolian race, to rights of scholarship in said public school.

It is alleged that Martha Lum is a resident of said school district, and is a native born citizen of the United States, that her parents were residents of the United States and engaged in the mercantile business, and not directly or indirectly connected with the consular service, or any other service, of the government of China, or any other government, at the time of her birth; that she sues by her next friend, Chew How, who is also a native born citizen of the United States and of the state of Mississippi, and her father joined in the said petition as parent.

It is alleged that said Martha Lum is a girl of good moral character between the ages of five and twenty-

one years, and an educable child, and that it is her father's duty under the law to send her to school, and that she desires to attend the Rosedale consolidated school; that at the opening of said school she appeared as a pupil, but was notified by the principal of the said public school in charge thereof that she would have to return home and would not be allowed to attend that school. It is further alleged that she was excluded from said public school on the ground that she was of Chinese descent, and therefore not a member of the white or Caucasian race, and that said order excluding her from attendance at said public school was made in obedience to instructions from the state superintendent of education of Mississippi.

It is further alleged that there is no school maintained in that district of Bolivar county for the education of Chinese children and none in the county. It is further alleged that the Constitution of the state requires that public schools be conducted, and that the state provides a general fund from the state treasury to maintain a school term of at least four months of each year, but that any county or separate school district may levy an additional tax to maintain the public schools for a longer time than the four-month term, and that said common school fund shall be distributed among the several coun· ties and separate school districts in proportion to the number of educable children in each in a manner provided by law, and that the state Constitution (Const. 1890, section 201) provides that it is the duty of the legislature to encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement, by establishing a uniform system of free public schools by taxation or otherwise, for all children between the ages of five and twenty-one years, and as soon as practicable to establish schools of higher grade; that in obedience to the said provision of the Constitution the legislature provided by law for the establishment and for the payment of the expenses of the Rosedale consolidated school.

It is further averred that petitioner's father is a tax-payer in said district and county, and helps support and maintain said school; that the said Martha Lum is an educable child between the ages of five and twenty-one years, and a resident within said district, and is entitled to attend said school as a pupil; that it is made the duty of her father to have her attend school, and that this is the only school conducted in said district available for her as a pupil, and that the right to attend said school is a valuable right; that she is not a member of the colored race, nor is she of mixed blood, but that she is of pure Chinese origin and descent, and a native born citizen of the United States and of the state of Mississippi, and of the Rosedale school district, and therefore an educable child and qualified to attend said school and has a right to do so, but that she is advised that on notification of the said state superintendent of education to the county superintendent of education and to the board of trustees of said public school that said trustees of the Rosedale consolidated school deny her the right to attend said school solely and exclusively on the grounds above stated, and that said exclusion from said public school denies her rights secured to her as a citizen of the state of Mississippi; that she is deprived thereof without due process of law, and on account of her being of Chinese descent, and therefore a member of the Mongolian race, and it is alleged that this is done without due protection of the law and contrary to the provisions of the Constitution of the United States, wherefore petitioner prays for a writ of mandamus to compel said public school authorities to admit said Martha Lum to attend said public school at Rosedale as a pupil.

The petition was demurred to on a number of grounds, among others, that the bill shows on its face that complainant is a member of the Mongolian or yellow race, and therefore not entitled to attend the public schools provided by law in the state of Mississippi for children of the Caucasian or white race. The demurrer was over-

ruled and a writ of mandamus granted, commanding said school authorities to permit petitioner, Martha Lum, to attend said Rosedale consolidated school as a pupil thereof.

Section 207 of the state Constitution of 1890 provides: "Separate schools shall be maintained for children of the white and colored races." This section of the Constitution is followed by statutes of the state providing for such schools, using the term "white and colored" throughout so far as the law applies to the public schools.

By statute it is provided that all the territory of each county of the state shall be divided into school districts separately for the white and colored races; that is to say, the whole territory is to be divided into white school districts, and then a new division of the county for colored school districts. In other words, the statutory scheme is to make the districts outside of the separate school districts, districts for the particular race, white or colored, so that the territorial limits of the school districts need not be the same, but the territory embraced in a school district for the colored race may not be the same territory embraced in the school district for the white race, and *vice versa*, which system of creating the common school districts for the two races, white and colored, do not require schools for each race as such to be maintained in each district, but each child, no matter from what territory, is assigned to some school district, the school buildings being separately located and separately controlled, but each having the same curriculum, and each having the same number of months of school term, if the attendance is maintained for the said statutory period, which school district of the common or public schools has certain privileges, among which is to maintain a public school by local taxation for a longer period of time than the said term of four months under named conditions which apply alike to the common schools for the white and colored races.

In *Moreau* v. *Grandich*, 114 Miss. 560, 75 So. 434, we held that the right to attend the public schools was a legal

right and enforceable in the courts, and that mandamus was the proper remedy to enforce the rights secured under the school law. We also held that the term ''white'' used in the above section of our Constitution means members of the Caucasian race. It was also said that the word ''colored'' included, not only negroes, but persons of mixed blood. In the argument in the present case it is insisted that this definition of ''colored'' limited and restricted the term ''colored'' entirely to persons of the negro race or who were of negro descent. We think a careful reading of the opinion in the *Moreau* v. *Grandich case, supra,* in the light of the statement of the facts, shows that the court did not intend to restrict the term ''colored'' to persons having negro blood in their veins or who were descendants of negroes or of the negro race. For prudent reasons the court did not go beyond the calls of that case in reference to this term.

In order to determine the meaning of the terms used in the above section of the Constitution, it will be necessary to consider other expressions in the same Constitution, and also legislation of the state bearing on the segregation of the races. In section 263 of the Constitution it is provided that marriage of a person of the white race with a negro or mulatto or with a person having one-eighth or more of negro blood shall be unlawful and void. It will be noted in this section that the terms ''negro'' and ''mulatto,'' ''or person who shall have one-eighth or more of negro blood,'' were used, and the constitutional prohibition against marriages between the races in confined to negroes and those having one-eighth or more of negro blood. *Moreau* v. *Grandich, supra,* we held that one-eighth of negro blood provided in the section relating to intermarriages was not controlling in fixing the *status* of the races for school purposes under section 207 of the Constitution. It will also be noted that section 207 of the Constitution, instead of using the word ''negro'' or having a specific quantity of negro blood, uses the word ''colored'' in describing the opposite races from the white race.

In section 2859, Code of 1892, just two years after the Constitution of 1890 was adopted, the legislature prohibited marriages between the white and Mongolian races, and between persons of the white race and persons having one-eighth or more of Mongolian blood. The same section also prohibited intermarriages between persons of the white race with those of negro blood or one-eighth negro blood, the prohibition with reference to marriages being identical in each case as to the negro and Mongolian races.

It will be noted further that neither section 263 of the Constitution nor section 2859 of the Code of 1892, which statute has been constantly in force since that date, prohibits any marriage or social relations between the negro and Mongolian races, and they are left free to maintain such social, including marriage, relations as they see proper to enter into.

Why did the Constitution use the term "negro" in one section and the term "colored" in the other section?

To all persons acquainted with the social conditions of this state and of the Southern states generally it is well known that it is the earnest desire of the white race to preserve its racial integrity and purity, and to maintain the purity of the social relations as far as it can be done by law. It is known that the dominant purpose of the two sections of the Constitution of our state was to preserve the integrity and purity of the white race. When the public school system was being created it was intended that the white race should be separated from all other races. It is true that the negro race was the only race of consequence so far as numbers were concerned. There were then some other races living within the state, of course. So far as we have been able to find, the word "white," when used in describing the race, is limited strictly to the Causcasian race, while the word "colored" is not strictly limited to negroes or persons having negro blood.

One of the definitions given to the word "colored," as applied to race, is "of a dark skin or non-Caucasian

race.'' Standard Dictionary. The, same definition is practically given by Mr. Webster in his dictionary. The word ''white,'' as applied to race, where not affected by statutory definition, is universally limited to the Caucasian race.

The United States courts have often dealt with the term ''white race'' when passing on questions of naturalization; it being provided by federal statutes originally that only persons of the white race could be naturalized. But, after the Civil War, the statute was amended so as to provide for the naturalization of aliens of African nativity and to persons of African descent. In the decisions of the supreme court of the United States it is expressly held that Mongolians do not come within the term ''white'' as used in reference to race. See *The Case of Ah Yup,* 5 Sawy. 155, Fed. Cas. No. 104, which has subsequently been followed by that court. See, also, *Ozawa* v. *United States,* 260 U. S. 178, 43 S. Ct. 65, 67 L. Ed. 199, and *Yamashita* v. *Hinkle,* 260 U. S. 199, 43 S. Ct. 69, 67 L. Ed. 209.

In its opinion in the *Ozawa case, supra,* the court said: ''The question then is, Who are comprehended within the phrase 'free white persons'? Undoubtedly the word 'free' was originally used in recognition of the fact that slavery then existed, and that some white persons occupied that *status.* The word, however, has long since ceased to have any practical significance and may now be disregarded.

''We have been furnished with elaborate briefs in which the meaning of the words 'white person' is discussed with ability and at length, both from the standpoint of judicial decision and from that of the science of ethnology. It does not seem to us necessary, however, to follow counsel in their extensive researches in these fields. It is sufficient to note the fact that these decisions are, in substance, to the effect that the words import a racial, and not an individual, test, and with this conclusion, fortified as it is by reason and authority, we en-

tirely agree. Manifestly the test afforded by the mere color of the skin of each individual is impracticable, as that differs greatly among persons of the, same race, even among Anglo-Saxons, ranging by imperceptible gradations from the fair blond to the swarthy brunette, the latter being darker than many of the lighter hued persons of the brown or yellow races. Hence to adopt the color test alone would result in a confused overlapping of races and a gradual merging of one into the other, without any practical line of separation. Beginning with the decision of Circuit Judge SAWYER, in *re Ah Yup* (1878), 5 Sawy. 155, Fed. Cas. No. 104, the Federal and state courts, in an almost unbroken line, have held that the words 'white person' were meant to indicate only a person of what is popularly known as the Caucasian race. Among these decisions, see, for example, *Re Camille*, 6 Sawy. 541, 6 F. 256; *Re Saito*, 62 F. 126; *Re Nian*, 6 Utah, 259, 4 L. R. A. 726, 21 P. 993; *Re Kumagai*, 163 F. 922; *Re Yamashita*, 30 Wash. 234, 237, 59 L. R. A. 671, 94 Am. St. Rep. 860, 70 P. 482; *Re Ellis*, 179 F. 1002; *Re Mozumdar*, 207 F. 115, 117; *Re Singh*, 257 F. 209, 211, 212; and *Re Charr*, 273 F. 207. With the conclusion reached in these several decisions we see no reason to differ. Moreover, that conclusion has become so well established by judicial and executive concurrence and legislative acquiescence that we should not, at this late day, feel at liberty to disturb it, in the absence of reasons far more cogent than any that have been suggested. *United States* v. *Midwest Oil Co.*, 236 U. S. 459, 472, 59 L. Ed. 673, 680, 35 Sup. Ct. Rep. 309.

"The determination that the words 'white person' are synonymous with the words 'a person of the Caucasian race' simplifies the problem, although it does not entirely dispose of it. Controversies have arisen and will no doubt arise again in respect to the proper classification of individuals in border-line cases."

In the case of *Yamashita*, 30 Wash. 234, 70 P. 482, 94 Am. St. Rep. 860, the court said: "The courts, Federal

and state, have uniformly determined that Chinese are not eligible to naturalization, because not white persons.''

In the same opinion the court discusses the divisions of the human race and adopts that of Blumenbach, who classifies the races as follows: '' (1)   The Caucasian, or white race, to which belong the greater part of the European nations and those of Western Asia; (2) the Mongolian, or yellow race, occupying Tartary, China, Japan, etc.; (3) the Ethopian, or negro (black) race, occupying all Africa, except the North; (4) the American, or red race, containing the Indian of North and South America; and (5) the Malay, or brown race, occupying the islands of the Indian Archipelago.''

See, also, 7 Cyc. 167; *Plessy* v. *Ferguson,* 163 U. S. 537, 16 S. Ct. 1138, 41 L. Ed. 256; and *Cory* v. *Carter,* 48 Ind. 327, 17 Am. Rep. 738.   In *Adelle* v. *Beauregard* (1810), 1 Mart. (O. S. La.) 183, at page 184, in discussing the question of the color of persons as persons of color, the court said: ''Persons of color may have described from Indians on both sides, from a white parent, or mulatto parents in possession of their freedom.''

In *State* v. *Chavers,* 50 N. C. 11, the court was called on to construe the phrase ''free persons of color'' as used in a statute of that state which provided: ''That all free persons descended from negro ancestors to the fourth generation inclusive, though one ancestor of each generation may have been a white person, shall be deemed free negroes and persons of mixed blood.''

The defendant was indicted as a ''free person of color'' for carrying a shotgun about his person contrary to that statute.   The indictment was demurred to on the ground that the phrase ''free person of color'' might apply to other persons than those of negro descent.   At page 15, 50 N. C., the court said: ''Free persons of color may be, then, for all we can see, persons colored by Indian blood, or persons descended from negro ancestors beyond the fourth degree.   The indictment then, in the

present case, may embrace a person who is not a free negro within the meaning of the act, and for that reason, it cannot be sustained.''

In the case of *People* v. *Hall,* 4 Cal. 399, the supreme court of California had under consideration the question of the admissibility of evidence against a white person by a Chinaman, a witness, under a statute which provided in one section that no Indian or negro shall be allowed to testify as a witness in any action in which a white person is a party and another statute which provided: ''No black or mulatto person, or Indian shall be allowed to give evidence for or against a white person.''

At page 403, 4 Cal. the court said: ''The word 'black' may include all negroes, but the term 'negro' does not include all black persons.

''By the use of this term in this connection, we understand it to mean the opposite of 'white,' and that it should be taken as contra-distinguished from all white persons.

''In using the words, 'No black, or mulatto person, or Indian shall be allowed to give evidence for or against a white person,' the legislature, if any intention can be ascribed to it, adopted the most comprehensive terms to embrace every known class or shade of color, as the apparent design was to protect the white person from the influence of all testimony other than that of persons of the same caste. The use of these terms must, by every sound rule of construction, exclude every one who is not of white blood. . . . The word 'white' has a distinct signification, which *ex vi termini,* excludes black, yellow, and all other colors. It will be observed, by reference to the first section of the second article of the Constitution of this state, that none but white males can become electors, except in the case of Indians, who may be admitted by special act of the legislature. On examination of the constitutional debates it will be found that not a little difficulty existed in selecting these precise words, which were finally agreed upon as the most compre-

hensive that could be suggested to exclude all inferior races.

"If the term 'white,' as used in the Constitution, was not-understood in its generic sense as including the Caucasian race, and necessarily excluding all others, where was the necessity of providing for the admission of Indians to the privilege of voting, by special legislation?

"We are of the opinion that the words 'white,' 'negro,' 'mulatto,' 'indian,' and 'black person,' wherever they occur in our Constitution and laws, must be taken in their generic sense, and that, even admitting the Indian of this Continent is not of the Mongolian type, that the words black person,' in the fourteenth section must be taken as contradistinguished from white, and necessarily excludes all races other than the Caucasian."

In *State* v. *Treadaway*, 126 La. 300, 322, 52 So. 500, 508, 139 Am. St. Rep. 514, at page 531 (20 Ann. Cas. 1297), the court in discussing the meaning of the word "colored," after reviewing numerous statutes and decisions defining the term, says: "These decisions are authority that a negro is necessarily a person of color; but not that a person of color is necessarily a negro. There are no negroes who are not persons of color; but there are persons of color who are not negroes."

While the court in the *Treadaway case, supra,* reached the conclusion that under the Louisiana statutes and decisions the term "colored persons" was limited to negroes and those having negro blood, it recognized that the term "colored person" was not necessarily limited to negroes and those having an admixture of negro blood in their veins.

As shown by the above definitions the term "white" as used in section 207 of our Constitution is limited to the Caucasian race. We have found no definition to the contrary except where it was a legislative definition embraced either in a statute or a constitution. Some of the states have statutory definitions that make the term "white race" include other races. But when no such

statutory definition exists all the authorities hold that the term "white" as applied to race does not embrace any other race than the Caucasian. On the other hand, the term "colored," as applied to race, may include any race other than the Caucasian or white race. Most of the states have defined by statutes what constitutes a "colored person" or a "colored race," and of course, where the statutes have defined these terms, the courts follow the statutory definition.

In our state no statute has defined the term "colored race," and, considering the policy of the state indicated above, we think that the constitutional convention used the word "colored" in the broad sense rather than the restricted sense; its purpose being to provide schools for the white or Caucasian race, to which schools no other race could be admitted, carrying out the broad dominant purpose of preserving the purity and integrity of the white race and its social policy.

It is said by the appellant that this court in the case of *Heirn* v. *Bridault,* 37 Miss. 209, construed the phrase "free woman of color" as synonymous with "free negro," and that this definition is to be carried into the Constitution and so interpreted would mean the "negro race or persons having negro blood," and would not include a member of the Mongolian race. In the case of *Heirn* v. *Bridault, supra,* the court held that the phrase "free woman of color," as used in the instrument there under consideration, was synonymous with "free negro." But we do not think that this decision is authority for holding that the Constitution makers intended the phrase to be used in the limited and restricted sense. It is true that the general meaning of the words "colored person" is understood to refer to a negro or a person having negro blood. But that is not the only definition of the phrase "a colored person," and it is clear that the constitutional convention of 1890 was using every means at its command to protect and preserve the white race from admixture with other races.

We must construe the Constitution so as to give effect to the intention of its makers. Taking all of the provisions of the law together, it is manifest that it is the policy of this state to have and maintain separate schools and other places of association for the races so as to prevent race amalgamation.

Race amalgamation has been frowned on by Southern civilization always, and our people have always been of the opinion that it was better for all races to preserve their purity.

However, the segregation laws have been so shaped as to show by their terms that it was the white race that was intended to be separated from the other races. The legislature has in some of the statutes provided for special schools for the Indian race, and any other race unprovided for, but under the general school laws a number of pupils are required to create one of these special schools.

The legislature is not compelled to provide separate schools for each of the colored races, and, unless and until it does provide such schools and provide for segregation of the other races, such races are entitled to have the benefit of the colored public schools. Under our statutes a colored public school exists in every county and in some convenient district in which every colored child is entitled to obtain an education. These schools are within the reach of all the children of the state, and the plaintiff does not show by her petition that she applied for admission to such schools. On the contrary the petitioner takes the position that because there are no separate public schools for Mongolians that she is entitled to enter the white public schools in preference to the colored public schools. A consolidated school in this state is simply a common school conducted as other common schools are conducted; the only distinction being that two or more school districts have been consolidated into one school. Such consolidation is entirely discretionary with the county school board having reference to the conditions

existing in the particular territory. Where a school district has an unusual amount of territory, with an unusual valuation of property therein, it may levy additional taxes. But the other common schools under similar statutes have the same power.

If the plaintiff desires, she may attend the colored public schools of her district, or, if she does not so desire, she may go to a private school. The compulsory school law of this state does not require the attendance at a public school, and a parent under the decisions of the supreme court of the United States has a right to educate his child in a private school if he so desires. But plaintiff is not entitled to attend a white public school.

Therefore the judgment of the court below will be reversed and the petition dismissed.

*Reversed and dismissed.*