**Bernice ARMSTEAD et al., Plaintiffs,**

**v.**

**STARKVILLE MUNICIPAL SEPARATE SCHOOL DISTRICT et al., Defendants.**

**No. EC70–51.**

United States District Court,
N. D. Mississippi, E. D.

July 27, 1971.

See also D.C., 325 F.Supp. 560.

Stephen J. Pollak, and Richard M. Sharp, of Shea & Gardner, Washington, D. C., T. H. Freeland, III, and G. A. Gafford, of Freeland & Gafford, Oxford, Miss., for plaintiffs.

Thomas J. Tubb, of Tubb & Stevens, West Point, Miss., William Q. McKee of McKee & McDowell, Starkville, Miss., for defendants.

### MEMORANDUM OF DECISION

ORMA R. SMITH, District Judge.

This Memorandum of Decision contains the court's findings of fact and conclusions of law on Counts Two, Three and Four in this action in accordance with Rule 52, Fed.R.Civ.P.

Defendants are sued in the counts aforesaid for the alleged impermissible and wrongful discharge of a principal and three classroom teachers who were employed in the Starkville Public School system during the 1969–1970 school year, and who were not reemployed for the succeeding school year.

Count Two concerns Mr. Creed Buck, a former black principal of a formerly all-black school in the system. Mr. Buck came to the system in 1957 as an elementary school principal and assistant high school principal. Later, he was transferred to a different elementary school as principal, in which capacity he served until his separation from the district at the close of the 1969–1970 school year. Mr. Buck contends he was fired because of his race and also because he exercised his first amendment rights. Defendants contend that Mr. Buck voluntarily resigned his position. Defendants concede, however, if Mr. Buck was coerced to resign because of the exercise of protected constitutional rights they must take him back into the system. Defendants assert that the evidence creates an issue of fact, the determination of which will resolve the controversy between Mr. Buck and the school district.

Count Three involves rights of Mrs. Novella Buck, wife of Mr. Buck, a black classroom teacher in the all-black elementary school in which her husband served as principal. The issue here is whether the school board was justified in refusing to accept the recommendations of the principal and superintendent that Mrs. Buck be reemployed. Mrs. Buck contends that she was not reemployed because of her race and because she exercised her first amendment rights to protest the racially discriminatory policies of the board in the retention and employment of school principals and classroom teachers in the district.

Mrs. Jeannette Peterson and Mrs. Carolyn Reeves, two first-year white classroom teachers, who taught in all-

black schools in the district during the school year 1969–1970 are plaintiffs in Count Four of the complaint. They assert that they were not reemployed because they associated with and exhibited concern for the black community and especially the black school children attending the schools in which they taught, and, also that they chose to express themselves concerning the plight of the black students.

The four plaintiffs qualified for reemployment in the school district under the stringent requirements of the school board's Policy 13–69 which was the subject of Count One of the complaint and which has been determined by the court to be racially discriminatory and unenforceable.

### MR. CREED BUCK

Dr. B. H. Buchanan came to the Starkville Schools as superintendent in 1965. At this time Mr. Buck was principal of the all-black Emerson Elementary School. Dr. Buchanan did not recommend Mr. Buck for reemployment as the principal of the school because he did not consider Mr. Buck qualified to hold the position. The school board, however, asserting that they were acting in the interest of racial harmony in the community, continued Mr. Buck in the school system. While Dr. Buchanan did not recommend Mr. Buck for reemployment in any succeeding year, he did not voice objections. Dr. Buchanan, however, continued to have the same opinion that Mr. Buck was not an efficient and competent principal. The school district continued to employ Mr. Buck until his separation from the district at the end of the 1969–70 school year. During this period of time the defendant school district operated a dual system of schools, in which the black schools, including Emerson Elementary School, were all-black, and the formerly all-white schools were predominately white.

After the adoption by the school board of Policy 13–69, made effective September 1, 1970, Mr. Buck, as Chairman of the Special Problems Committee of the Starkville Teachers Association, an association composed principally of black teachers in the Starkville schools, approached Dr. Buchanan and voiced the disapproval of the policy by the members of the association. The association contended that the requirements of the policy worked a hardship on black school teachers.

Mr. Buck and members of his committee were invited to meet with the board to discuss the problem. At the meeting members of the committee presented their views. Mr. Buck, in his closing remarks told the board members that he knew they had difficult decisions to make, but the matter was of great concern to his people, and he would advise them to say their prayers and sleep with one eye open because somebody might burn down their homes. The board members did not take this as a threat that Mr. Buck would burn their homes down, but, rather, that there was a likelihood that someone else might do so. The board members, thought, however, that the statement by Mr. Buck, a principal in the school, was inappropriate and in bad taste. Dr. Buchanan later made this fact known to Mr. Buck.

A desegregation case was filed against the district in July 1969, Montgomery v. Starkville Municipal Separate School District, No. EC 69–37(a) (s), and on February 5, 1970, the court directed the district to implement immediately the faculty desegregation requirements of *Singleton*.[1]

In the change-over, a number of white classroom teachers were transferred from formerly all-white faculties to the Emerson School of which Mr. Buck was the principal. At the first faculty meeting Mr. Buck made statements which one of the white teachers considered inappropriate. Mr. Buck undertook to greet one of the teachers with a handshake. These events were made known

---

1. Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211, 1217–1218 (5th Cir. 1970).

to Dr. Buchanan who reprimanded Mr. Buck about his conduct. Dr. Buchanan did not condemn the remarks or the handshake as being, per se, inappropriate, but stated to Mr. Buck that he failed to exercise good judgment on the occasion.

There were other incidents brought out in the evidence which brought about reprimands of Mr. Buck by Dr. Buchanan.

After the faculty incident Dr. Buchanan talked with Mr. Buck about the matter. The conversation took place in Dr. Buchanan's office. In an hour or so after Mr. Buck left the office he called Dr. Buchanan by telephone and requested authority to leave his building so that he might look for employment elsewhere as Mr. Buck stated that he believed the district would be better off without him and his wife. Dr. Buchanan informed Mr. Buck that Mr. Buck should think about what he had said, because if Mr. Buck was going to follow through with his plan, his action would be considered as a resignation. Mr. Buck left the building as he had planned.

At a principals' meeting on Saturday after the conversation between Mr. Buck and Dr. Buchanan, Dr. Buchanan made the announcement that Mr. Buck has resigned and the position was open. Mr. Buck was in attendance and did not comment on the announcement.

■ There are other facts in evidence on the issue. However, it is not necessary for the court to go into further detail in regard thereto. The decision is difficult to make. The evidence reflects that Mr. Buck's school experiences were not always pleasant, but the court is not convinced that the resignation was in fact the result of coercion. Mr. Buck was aware that Dr. Buchanan was displeased with the manner in which he performed some of his work as principal. He was also aware that the board was not pleased with his remarks at the meeting mentioned above, and might not extend his employment. Mr. Buck elected to seek employment elsewhere and no-

tified the superintendent that he had elected to do so.

Applying the rule enunciated by the United States Court of Appeals for the Fifth Circuit in Fluker and Parsons v. Ala. St. Bd. of Ed., 441 F.2d 201 (5th Cir., Opinion dated March 31, 1971), the court is of the opinion and so finds that Mr. Buck has not met the burden placed upon him and has failed to prove that his separation from the school district was not voluntary on his part.

In *Fluker* the court said:

"[T]he law in this Circuit is crystal clear that a nontenured teacher alleging that he has been dismissed for constitutionally impermissible reasons 'must bear the burden * * * of proving that a wrong has been done by the collegiate action in not rehiring him.' Sindermann v. Perry, 5th Cir. 1970, 430 F.2d 939, 944. See also Thaw v. Bd. of Public Instruction, 5th Cir. 1970, 432 F.2d 98; Glover v. Daniel, 5th Cir. 1970, 434 F.2d 617 [November 5, 1970]." 441 F.2d at 205.

### MRS. NOVELLA BUCK

Mrs. Buck, like her husband, has been with the Starkville School system for a number of years. Before Dr. Buchanan came to the district, Mrs. Buck taught at an all-black elementary school, other than the one at which her husband was the principal. The superintendent of the schools at the time reported to the board that Mrs. Buck could not get along with her principal and recommended that she be transferred to the school where her husband was the principal. The board acquiesced in this proposal. No other problems have arisen out of Mrs. Buck's employment by the district.

Mrs. Buck does not accept the fact that her husband resigned and has always contended the district fired him. To express her displeasure at the actions of the board with reference to the termination of her husband's tenure with the district and its alleged racially discriminatory policies, Mrs. Buck drew a picture depicting a black man hanging on a cross with blood spilling from his side.

There were spiritual quotations on the picture, and several questions. One question, similar to the others, was "Were you there when the black principal and teachers were fired". There also appeared on the picture, "I am Novella S. Buck. One of these days all mankind will have justice". Mrs. Buck also wrote a poem and drafted a call for help.[2] The documents were mailed to numerous persons in and out of Starkville. Dr. Buchanan was among those receiving them.

Dr. Buchanan left the school system at the end of the 1969–1970 school year, and was succeeded by Mr. Paul Armstrong, who, prior to that time served as assistant superintendent. Mrs. Buck's principal and the superintendent-elect recommended Mrs. Buck for reemployment for the 1970–1971 school year. The school board did not follow the recommendation. The board refused to elect Mrs. Buck to the faculty for the 1970–1971 school year. The minutes of the board do not mention the fact that Mrs. Buck was not reemployed. The only reference thereto, is contained in the list of teachers elected for the year. This list does not include her name. Mrs. Buck was notified by the superintendent that her contract would not be renewed.

The defendant school board, rarely, if ever, fails to elect a classroom teacher who is recommended by both the principal and superintendent.

The board members testified that they did not renew Mrs. Buck's contract because her husband was leaving the system and they feared a reoccurrence of the incident at her former school. The evidence is clear, however, that Mrs. Buck's activities with regard to the documents influenced, at least to some extent, the board's decision not to reemploy her.

Mrs. Buck used the documents to express her attitude toward the board policies concerning the hiring of black teachers. The documents were not directed toward any particular person though Dr. Buchanan and other school officials might have reasonable grounds to conclude that they were directed toward them. The publication of the documents did not interfere with or impair the regular and general operation of the school.

■ The court is of the opinion and so finds that Mrs. Buck's activities with regard to the documents aforesaid were protected by the first amendment. Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

■ The board did not give Mrs. Buck an opportunity to defend the charge that she was uncooperative with the former principal, but seized upon the incident to deny Mrs. Buck's reemployment. Mrs. Buck's long tenure with the Starkville School System created an expectancy that she would enjoy continued reemployment. The rejection of the recommendations of the superintendent-elect and principal that Mrs. Buck be reemployed to some degree constituted retaliation for Mrs. Buck's criticism of the board's teacher-hiring policy. Such activities are protected by the first amendment and the board cannot lawfully deny Mrs. Buck reemployment in the school district on account thereof. See *Fluker*, supra, 441 F.2d at 207.

■ The denial of due process ordinarily requires the court to return the matter to the board for further proceedings. However, in this case, the board has already acted to discharge Mrs. Buck on grounds which violate her constitutionally protected rights. In such circumstances the court is of the opinion that Mrs. Buck is entitled to relief in this court.

2. The picture, poem and call for help will be referred to in this opinion as "documents".

## MRS. JEANNETTE PETERSON AND MRS. CAROLYN REEVES

Mrs. Reeves and Mrs. Peterson are first-year teachers, that is, they have been employed in the Starkville School System for only one year. The evidence shows that first-year teachers in the Starkville School System may expect reemployment, if they have been satisfactory teachers and are found to be competent and efficient. It is customary for the principal to recommend teachers on the faculty at the principal's school for reemployment where he has found them to be competent, efficient and satisfactory teachers. The superintendent adds his recommendations thereto and transmits the teachers' names to the school board for reemployment.

The evidence reflects and the court finds that Mrs. Peterson and Mrs. Reeves performed their work as teachers in an efficient, competent and satisfactory manner. Both teachers were recommended by the principal with whom they served for reemployment for the school year 1970–1971.

Mrs. Peterson was to be transferred for the 1970–1971 school year to a school different from the one in which she taught during the school year 1969–1970. The principal of the transferee school would not accept her transfer and refused to recommend her for his faculty. Mrs. Peterson, lacking the recommendation of the transferee principal, was not reemployed. Her name was not submitted to the board for reemployment.

Mrs. Reeves was recommended for reemployment by her principal, but the superintendent-elect did not recommend her. Mrs. Reeves' reemployment was not considered by the board in the absence of a recommendation by the superintendent.

Mrs. Reeves and Mrs. Peterson taught in all-black schools, the faculties of which were predominately black. They evidenced concern for the black pupils in their schools and for the black community in general. They participated in the activities of the all-black school and in school related activities in the black community. They visited in the homes of black friends and acquaintances, and generally evidenced a concern for the welfare of the black citizens.

The school board, under a court order to come forward with a plan which would dismantle the dual system and implement a unitary system, proposed the closing of three of the four black schools in the district, and the transfer of the black pupils to their white counterparts. The white schools were not large enough to accommodate the increased and enlarged student body. The board proposed a "split session" arrangement wherein the pupil attends school in either a morning or an afternoon shift. The proposed plan was presented by Mr. Armstrong, the assistant superintendent at the time, to the entire faculty at a faculty meeting in December 1969. Mrs. Peterson was among those present. When this portion of the school board's plan was read by Mr. Armstrong, Mrs. Peterson asked him to explain its effect. Mr. Armstrong read that portion of the plan again. Mrs. Peterson was concerned about the closing of the black schools, and evidenced her displeasure with the proposal. She became upset and angry, leaving the meeting hurriedly. Mr. Armstrong did not take offense at Mrs. Peterson's actions but thought them to be unprofessional. Mrs. Peterson later wrote a letter of apology to Mr. Armstrong.

In the assignment of students for the 1970–1971 school year, Mrs. Peterson's class was transferred from the all-black school to a previously predominately white school. Mrs. Peterson was subject to transfer along with the class. Mr. Armstrong submitted her name to the new principal, who refused to accept her in his faculty. The principal knew Mrs. Peterson only by sight and had never had any direct contact with her. Mrs. Peterson was not interviewed by the new

principal, nor did he make any investigation as to her qualifications. The principal summarily decided that Mrs. Peterson was not acceptable to him and his faculty because she had failed to control her temper at the faculty meeting above mentioned.

Mrs. Peterson contends that the faculty meeting incident serves only as a sham or excuse for her dismissal, and that the real reason she was not reemployed was her association with and concern for the black people in the community.

Mrs. Reeves taught the third grade in the all-black Emerson Elementary School. She completed her school year without incident, except one occasion hereinafter mentioned.

Mrs. Reeves, like Mrs. Peterson, was prominently engaged in the activities of the all-black school at which she taught and school-related activities in the black community. She also visited in the homes of black friends and openly associated with them.

In the spring of 1970, after the entry of the court's order in the segregation cases, but before the effective date of the student assignment provisions of the order, the school officials determined to give each student in the school a comprehensive test for basic skills. The pupils in Mrs. Reeves' room had not previously experienced such a test. The test was given and administered through the Title I program. The test was administered by a proctor, and a proctor's aide. It was their duty to see that the children correctly marked the circles on the chart. The classroom teacher could leave the room while the test was being given, or she was privileged to stay with her pupils. Mrs. Reeves elected to stay with her pupils. She elected to stay in the room while the test was being given. Occasionally during the day Mrs. Reeves assisted the proctor and his aide in working with the children. Mrs. Reeves was disturbed about the test, because she had

the opinion that it was unfair to give the test in one day, when the instructions called for the test to be given over a two-day period; and, additionally, because of the race, age and inexperience of the children in her room. She also felt that her children would not fare well on the test which would be disadvantageous to them in the student assignments to follow.

Mrs. Reeves voiced her disapproval to some of her fellow teachers, and to the supervisor of the test. She made an unsuccessful attempt to see the superintendent-elect to discuss the matter. After leaving school for the day Mrs. Reeves contacted a black member of the Title I Advisory Committee and of the School District's Bi-racial Committee and registered her protest.

Mrs. Reeves was severely criticized for her activities in regard to the test by the superintendent-elect who characterized her actions as unprofessional. Mrs. Reeves was not, however, afforded a hearing on the charges of misconduct and the superintendent summarily reached the conclusion that Mrs. Reeves should not be reemployed.

Mrs. Reeves, like Mrs. Peterson, contends that the test incident was nothing more than a sham and excuse to dismiss her from the school faculty; and, that the real reason for her dismissal was her activities in support of the rights of the black pupils and her association with black members of the community.

Mrs. Reeves was not recommended to the board by the superintendent for reemployment, although her principal recommended her highly.

■■ The dismissal of Mrs. Peterson and Mrs. Reeves occurred at the superintendent's level without the issue reaching the board. In Mississippi a teacher must be recommended for employment by the superintendent of the schools, before the board has statutory authority to employ the teacher. Lucas

v. Chapman, 430 F.2d 945, 948 (5th Cir. 1970); Lott v. State ex rel. Kelly, 239 Miss. 97, 121 So.2d 402 (1960). This does not, however, make the termination of Mrs. Reeves and Mrs. Peterson unreviewable. The superintendent, and the superintendent-board combination, are as bound to follow constitutional requirements as the board would be acting alone. Lucas v. Chapman, supra.

The court finds that the sole issues concerning the rights of Mrs. Reeves and Mrs. Peterson grow out of the test incident (Mrs. Reeves) and the faculty meeting incident (Mrs. Peterson). If their dismissal was occasioned, or even partially so, by their activities with the black students and the black community, or by the exercise of the rights of expression or association, then their dismissal was unlawful and they are entitled to reinstatement and to recover damages occasioned thereby. The evidence does not sustain the contention that either Mrs. Reeves or Mrs. Peterson was an incompetent teacher, so as to justify either's dismissal on that ground.

The defendant board has not had an opportunity to act upon the dismissal of Mrs. Reeves and Mrs. Peterson. The court is of the opinion that the board should be afforded this opportunity.

The board must afford Mrs. Reeves and Mrs. Peterson a full hearing on the charges preferred against them by the superintendent and principal.

The court will retain jurisdiction of Count Four of the complaint until defendants have afforded Mrs. Reeves and Mrs. Peterson the hearing mentioned above, and the results have been made known to the court. At that time the court will enter such order on Count Four as the court considers appropriate, taking into consideration all of the evidence in the case.

The court will enter an order implementing the court's decision in this action.