Vertrees MOSES, by his father and next friend Wilton Moses, and all other Negroes similarly situated

v.

**WASHINGTON PARISH SCHOOL BOARD, a corporation, et al.**

Civ. A. No. 15973.

United States District Court, E. D. Louisiana, New Orleans Division.

Aug. 9, 1971.

George M. Strickler, Jr., Elie, Bronstein & Strickler, Debra Millenson, New Orleans, La., for plaintiffs.

Hon. W. W. Erwin, Dist. Atty. for 22nd Judicial Dist., Franklinton, La., Welton O. Seal, Seal, Lee & Branch, Bogalusa, La., for defendants.

HEEBE, District Judge:

The issue presented for determination is whether or not the Franklinton Elementary School can assign students in the recently desegregated school on the basis of standardized ability and achievement tests. Without determining the *per se* validity of the use of such tests, the Court holds that testing, as presently used in Franklinton Elementary denies plaintiffs equal educational opportunity and impedes the immediate establishing of a truly unitary school as

compelled by Alexander v. Holmes County Bd. of Ed., 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969), and has the effect of tending to preserve the dual system of education prohibited under Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

### School Desegregation in Washington Parish: 1965–70

This suit was filed in September 1965. At that time the town of Franklinton was served by four schools, all-white Franklinton Elementary and High School and all-black Washington Parish Elementary and High School. The first integration in the system occurred in January 1967 when nineteen black students enrolled in formerly all-white schools under a freedom-of-choice desegregation plan. At the beginning of the 1967–68 school year, 106 black students chose to attend white schools. Seventeen of these students enrolled in Franklinton Elementary.

In April 1968, having found that freedom-of-choice had failed to effectively desegregate the system, the Court modified its existing orders to provide during the 1968–69 school year for the initial assignment of all students by freedom-of-choice followed by the mandatory transfer of black students sufficient to make the student body of each white school twenty per cent black. Under this plan approximately 672 black students were transferred to white schools in September 1968. Of this number 138 were assigned to Franklinton Elementary. The first faculty integration also occurred in 1968–69. The staff of Franklinton Elementary was composed that year of five black teachers and twenty-three whites. As the parish's white schools were gradually desegregated, the black schools remained all-black, both in student population and, until 1968–69, in faculties. These schools were not only segregated but in comparison to their white counterparts decidedly inferior.

After Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), this Court ordered the complete unification of the system by order dated July 3, 1969.

As a result of this order, the black students formerly attending the all-black Washington Parish School began attending Franklinton Elementary, the former all-white school. The black school followed an educational policy of graded structure and heterogeneously grouped students while the white school followed an educational policy of level structure and homogeneously grouped students.

Franklinton Elementary has divided its teaching (and/or learning) program into eleven levels, instead of the traditional six grades. However, the ordinary student usually completed the eleven levels in six years. In explaining the school's program to the Court and to parents, the school authorities analogize the level structure to the grade structure. Frequently, the terms "level" and "grade" are used with little or no difference in meaning. Levels 1 through 4 are comparable to grade one; levels 5 and 6 are comparable to grade two; levels 7 and 8 are comparable to grade three; and levels 9, 10 and 11 are comparable to grades four, five, and six, respectively.

Franklinton Elementary groups all its students homogeneously. The grouping of students entering the first level is based on two standardized tests: The Primary Mental Ability Test (P.M.A.)— an I.Q. test—and the Ginn Reading Readiness Test. The grouping of all other students is based on the S.R.A. Achievement Test, the Ginn Reading Achievement Test and teacher evaluation.

Students are grouped first into levels and then homogeneously grouped into sections. Within a single level there may be several sections, each denominated with a letter of the alphabet; the letter A represents the highest section, B the next highest, and so on. The educational philosophy for all this grouping is to put students of more or less equal ability and achievement into small groups which can progress through the

various levels of materials to be learned at their pace. Under this method, theoretically every child progresses through all the materials either at a rapid or slow pace; consequently, no child ever fails, even though he may remain in the Elementary School for more than six years.

This educational program was initiated in Franklinton Elementary by Mr. Earl Brown, Acting Superintendent and formerly principal, in 1953. The program was found to be acceptable in the community, and endures to date, even though it exists in only one school in the parish.

In 1969 the elementary schools were integrated. More accurately stated, Franklinton Elementary (the former white school) absorbed Washington Parish Elementary (the former black school). The all-black school was closed and fifteen new classrooms were added at the white school. The closing of a school for purely racial reasons is impermissible. Such a practice was recently condemned in Bell v. West Point Mun. Sep. School District, 446 F.2d 1362 (5th Cir. 1971), which held that " * * * an otherwise useful building may not be closed merely because the school board speculates that whites will refuse to attend the location. Such action constitutes racial discrimination in violation of the Fourteenth Amendment."

In *West Point*, the closing of the black school necessitated conducting classes on a "two shift a day" basis. In Franklinton the closing of the black school prompted the misspending of $44,888.00 of funds granted under Title I of the Elementary and Secondary Education Act to build fifteen new temporary classrooms at the white school. A report dated January 20, 1971, issued to Mr. William Dodd, Superintendent of Public Education for Louisiana, by S. P. Marland, Jr., U. S. Commissioner of Education, indicates that " * * * large amounts of Title I funds were being expended for general aid for the schools, rather than to conduct activities designed specifically to meet the special educational needs of educationally deprived children as required by Title I and Regulations thereunder * * *." Mr. Charles Jarreau who now administers Federally Assisted Programs for the Louisiana Department of Education testified that using Title I funds to build those classrooms was a misuse of the funds.

Not only did the blacks lose their school, they also lost their principal and the educational policy of using a graded structure. The school board did not attempt to explain to the black parents and students involved why the educational policy of levels and homogeneous grouping which had never been used in the all-black school would be used in the new unified school in preference to the educational policy using grade structure previously in force in the black school. It was obvious the white school was to be maintained with its white principal and his educational policy.

Thus, while testing, which is essential in formulating the homogeneous groups, was not imposed in Franklinton Elementary to coincide with integration, testing was first imposed on blacks at the time of full integration in 1969. Beginning in 1953, testing was imposed on all (white) students attending Franklinton Elementary. Until the 1969–70 school year all students were placed in two homogeneous groups: math and reading. Beginning with 1969–70, the year of total integration, all students were grouped in only one homogeneous group based entirely on reading achievement and ability. The reason for this change was not adequately explained although Mr. Ray Kennedy, the principal of Franklinton Elementary, did testify that one reason was the large influx that year of black students and teachers into the formerly all-white school. However, the effects of this change seem clear. It was the unanimous opinion of all the expert witnesses who testified on this subject that if homogeneous grouping is to function soundly, the grouping should be based on as many dimensions as possible. The experts agreed that group-

ing students for all subjects of study based on the test scores they receive in one subject such as reading is the worst form of grouping because it can often retard the child's progress in other subject areas. Applied to Franklinton, Dr. Scott Kester, plaintiffs' expert witness, testified that since black children tend to score lower on reading and verbal skills tests than on math and science tests, the effect of grouping them solely on their reading scores could seriously impede their progress in other areas, a result which apparently cannot be educationally justified.[1]

All experts likewise agreed that an essential feature of a non-graded ability-grouped educational structure designed to allow students to advance at an individual rate of progress is a remedial or compensatory educational program. Remedial education would hopefully provide individualized instruction for those students who are slower learners or come from disadvantaged backgrounds to allow them to catch up to the students who are advancing through the non-graded structure at the normal level of progress. While the school board claims that compensatory education does exist, this Court is convinced, after hearing all the testimony including that of teachers, experts, and the Court's expert witness, Dr. Leon Crowley, that no real compensatory education exists for individual students within a given section in the way of identifiable compensatory materials or individualized special attention. Rather, it appears that the school considered the nature of its homogeneous ability-achievement grouping to be in and of itself compensatory; that is, slow students were compensated by being placed with other slow students and being exposed to regular school materials at a slower pace. Dr. Crowley testified that such a program of compensatory education was not effective. This con-

clusion is buttressed by the findings of the HEW investigative team that little, if any, of the Title I funds earmarked for compensatory education was being used for that purpose. As stated in the summary of the report on Washington Parish:

"Over the years, although there have been sizable Title I *expenditures* in Washington Parish, there has been no viable Title I program designed to serve the *special educational needs* of educationally deprived children on the basis of a valid needs *assessment.*" At p. 12.

In this school, which is 69% black and 31% white, some fairly predictable racial patterns emerge in the groups as a result of the homogeneous ability or need grouping program based on testing. The higher sections within a level, denominated A and B, will have a higher percentage of whites than blacks, the middle and lower sections will have a higher percentage of blacks than whites, and the bottom sections, E, F and G, will almost invariably be 100% black. Eighty-two percent of the white students in the system in both the 1969–70 and 1970–71 school years were assigned to one of the top three sections in each grade while an average of 63% of all black students were assigned to the bottom three or four sections. Ninety percent of the students assigned to lower sections (D and below) over the past two years are black and significant percentages of the black enrollment of the school, (48% in 1969–70 and 37% in 1970–71), have been assigned to all-black classes (generally the lowest two sections of each grade).

These figures reflect another evil of the ability-achievement homogeneous grouping as practiced in Franklinton Elementary—the minimal amount of fluidity within the system. Part of the rationale of a non-graded structure is to

---

1. There was some testimony that one reason for this change to grouping based on only one dimension—reading—was the logistical inability to group the large number of incoming students on two dimensions. However justified this may have been for the first year, this in no way explains why Franklinton Elementary School to this day persists in one-dimensional grouping.

allow students to progress through the material at their own pace without having to wait until the end of a school year to get to new materials. Thus, in a successful non-graded structure, there should be a great deal of movement by students throughout the school year among the various levels of instruction. However, the evidence indicated that movement at Franklinton Elementary was very much like movement in a graded structure: nearly everyone remained in the same group and level throughout the entire school year and only changed groups and levels at the end of the year. This lack of mobility tends to lock students, especially those in the bottom sections, into the same section throughout grammar school. Since black students comprise the bulk of the lower sections, they tend to be most adversely affected by this lack of mobility.

The plaintiffs allege they are deprived of equal educational opportunity. Their argument is based (1) on the premise that homogeneous grouping cannot be educationally justified and produces inherently harmful effects on those in the lower groups, and (2) on the statistics which indicate there is a disproportionate number of blacks in the lower groups.

The Court listened to several education experts who discussed the pros and cons of homogeneous and heterogeneous grouping. Each expert referred to various studies to support his opinion.

The Court agrees with the opinion of its own witness, Dr. Crowley, who stated:

"Studies in the area of ability grouping are as numerous as they are inconclusive; grouping research tries hard to make up in bulk what it lacks in findings * * *. The problem then is: Do children grouped homogeneously achieve better over a limited period of time than children who are grouped heterogeneously, all other things being equal. Answer: Usually not. Further there is some evidence that while homogeneous grouping has no particular effect on children of high or middle ability, it adds to the disadvantage of children of low ability. At this point, the research has never validated the educational rationale of grouping, that everyone benefits."

Similarly, Dr. Kester testified for the plaintiffs that disadvantaged and minority groups did less well under homogeneous grouping than under heterogeneous grouping. Dr. Kester also referred to an article entitled "Grouping," written by Dr. Glen Heathers, and appearing in the Encyclopedia of Educational Research, pp. 559–70 (4th ed. 1969). In this report, Dr. Heathers gives several reasons for the detrimental effects of homogeneous grouping: (1) the self-fulfilling prophecy phenomena— teachers expect less from students assigned to low groups and teach them correspondingly less, and students who are assigned to low groups generally expect less of themselves and behave accordingly; (2) slow learners, in the absence of superior students, have fewer opportunities to learn vicariously through classroom activities in which they can be stimulated by other students; and (3) the quality of instruction offered low groups tends to be inferior to that offered groups made up of abler students. At 566.

The *per se* validity of testing as a basis for student assignments has never been ruled on but testing as the basis of assigning students in recently desegregated schools has not been permitted.

■ In Singleton v. Jackson Municipal Separate School District, 419 F.2d 1211 (5th Cir. 1969), rev. in part on other grounds, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970), the Fifth Circuit, sitting *en banc,* held that " * * * testing cannot be employed in any event until unitary school systems have been established." At 1219. Thus, where a dual school system is disestablished, testing is not allowed in the formulation of the unitary system. *See,* United States v. Sunflower County School District, 430 F.2d 839 (5th Cir. 1970); United States v. Tunica County School District, 421 F.2d 1236 (5th Cir. 1970).

Where a dual system had been disestablished for only one semester, the court again disallowed the use of testing as the basis for assigning students. Lemon v. Bossier Parish School Board, 444 F.2d 1400 (5th Cir. June 1971). In that case, the court said:

> "In *Singleton* we made it clear that regardless of the innate validity of testing, it could not be used until a school district had been established as a unitary system. We think at a minimum this means that the district in question must have *for several years* operated as a unitary system." (emphasis added)

In the case at bar, Washington Parish and the Franklinton Elementary School in particular has not operated as a unitary system for several years.

■ While no court has explained the rationale for not allowing the assignment of students on the basis of testing, a hint is given in United States v. Tunica County School District, *supra*. There, all the students who scored well on tests were to be assigned to the white school and those who scored poorly were to be assigned to the black school. It becomes readily apparent to anyone familiar with the nature of white and black schools in the South that the children going to the white school would be provided with better facilities, faculties and educational materials than their counterparts in the black schools. It is equally apparent, given the obvious reluctance and recalcitrance of school boards to establish unitary schools, that the school board in deciding to use testing probably anticipated that most whites would score well and thus used testing to maintain as many segregated schools as possible. Testing used to resegregate students in a recently desegregated school system is not permissible.

■ Courts are not school boards and do not derogate unto themselves the formulation of educational policies. But courts are the vigilant protectors of the constitutional rights of every American. If any existing school board policy vio-

lates or impinges on the equal protection clause of the Fourteenth Amendment, then that educational policy is impermissible.

■ This Court finds that the educational policy used at Franklinton Elementary to assign black students on the basis of the presently used testing violates their Fourteenth Amendment rights to be treated equally with white students. Homogeneous grouping is educationally detrimental to students assigned to the lower sections and blacks comprise a disproportionate number of the students in the lower sections. This is especially true where, as in Washington Parish, black students who until recently were educated in admittedly inferior schools are now competing with white students educated in superior schools for positions in the top sections.

Accordingly, it is ordered, adjudged and decreed that the Washington Parish School Board, Mr. Earl Brown, Acting Superintendent of the Washington Parish School System, and Mr. Ray Kennedy, Principal of the Franklinton Elementary School, their assigns and successors, be, and they are hereby, enjoined from continuing to assign students at the Franklinton Elementary School to classes on the basis of standardized ability and achievement tests.

It is further ordered, adjudged and decreed that the Washington Parish School Board, Mr. Earl Brown, Acting Superintendent of the Washington Parish School System, and Mr. Ray Kennedy, Principal of the Franklinton Elementary School, their assigns and successors, be, and they are hereby, ordered and directed to reassign students at the Franklinton Elementary School to heterogeneous, racially integrated classes.

It is further ordered, adjudged and decreed that the Washington Parish School Board be, and it is hereby, ordered to pay all costs of these proceedings and that the fee and expenses of Dr. Leon Crowley, the Court-appointed expert, be taxed as part of the costs of these proceedings.