Horace Willie **MONTGOMERY**, et al., Plaintiffs,

v.

**STARKVILLE MUNICIPAL SEPARATE SCHOOL DISTRICT, Defendant.**

No. EC83–293–LS–D.

United States District Court, N.D. Mississippi, E.D.

June 8, 1987.

Wilbur Colom, Colom & Colom, Columbus, Miss., for plaintiffs.

Beverley Franklin, Columbus, Miss., Dolton W. McAlpin, Lydia M. Quarles, McAlpin & Quarles, Starkville, Miss., for defendant.

## MEMORANDUM OPINION

. SENTER, Chief Judge.

Plaintiff intervenors bring this action alleging that the defendants are presently

maintaining a dual education system in the school district of Starkville, Mississippi, in contravention of the fourteenth amendment. As a result, plaintiff intervenors seek injunctive relief and an award of attorney's fees and costs.

A trial was held in this cause on September 29, 1986. Pursuant to Rule 52, Fed.R. Civ.P., the court issues the following findings of fact and conclusions of law.

### Historical Background

Prior to 1954, the City of Starkville, Mississippi, like most southern communities, maintained a dual system of public education which served to segregate black and white students.[1] In 1954 and 1955, the United States Supreme Court abolished the "separate but equal" doctrine and mandated desegregation of public schools "with all deliberate speed." *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (*Brown* I); *Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (*Brown* II). Local communities, construing "all deliberate

speed" as being equivalent to "no speed at all," refused to desegregate their schools in any meaningful way.[2] By the early sixties, a number of lawsuits had been filed by black students and their parents in an attempt to enforce the *Brown* rulings in Mississippi. *See, e.g., Evers v. Jackson Municipal Separate School District*, 328 F.2d 408 (5th Cir.1964).

On October 29, 1969, the Supreme Court sent the doctrine of "all deliberate speed" to its final resting place and directed that complete desegregation be effectuated immediately. *Alexander v. Holmes County Board of Education*, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969). Although the Fifth Circuit initially construed this to mandate elimination of dual systems on a deferred schedule, *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 (5th Cir.1970),[3] the Supreme Court held on January 14, 1970, that segregation had to be ended by February 1, 1970. *Carter v. West Feliciana School Board*, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 530 (1970).[4]

1. The maintenance of a dual educational system was implicitly sanctioned in 1896 when the Supreme Court noted that the Equal Protection clause of the Constitution permitted racially segregated facilities as long as they were equal in most respects. *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). In Mississippi, the maintenance of segregated schools was required by the state constitution, legislative enactments, and judicial pronouncements. *See* Article 8, § 207, Mississippi Constitution, Mississippi Code of 1942 Annotated § 207; Miss.Code Ann. § 6220.5 (1942); *Rice v. Gong Lum*, 139 Miss. 760, 104 So. 105 (1925), *affirmed*, 275 U.S. 78, 48 S.Ct. 91, 72 L.Ed. 172 (1927).

 Several law review articles have appeared which discuss school desegregation in Mississippi during the sixties. *See, e.g.,* Comment, "Problems In Faculty Desegregation," 43 Miss.L.J. 363 (1972); Stevens and Maxey, "Representing the Unrepresented: A Decennial Report on Public-Interest Litigation In Mississippi," 44 Miss.L.J. 333, 348–354 (1973).

2. Initially, this was accomplished by interpreting the school desegregation decisions to mean that a voluntary assignment system, alternatively referred to as a freedom-of-choice or *Jefferson* plan, would meet constitutional muster. *United States v. Jefferson County Board of Education*, 372 F.2d 836 (5th Cir.1966) (*Jefferson* I); *United States v. Jefferson County Board of Education*, 380 F.2d 385 (5th Cir.1967) (*Jefferson* II). The state legislature adopted this approach to

desegregation by enacting the Mississippi Pupil Assignment Statute which permitted students to attend the school of their choice. Miss.Code Ann. § 6334–01, *et seq.* (Supp.1954), Mississippi Laws 1954, Chapter 260. While "freedom of choice" was never held unconstitutional *per se,* the Supreme Court did hold that it was unacceptable where more effective remedies were available. *Green v. County School Board of New Kent County*, 391 U.S. 430, 441, 88 S.Ct. 1689, 1696, 20 L.Ed.2d 716 (1968).

3. The Court of Appeals in *Singleton* provided for desegregation to be accomplished by a two-step process. Desegregation of staff and facilities was to occur by February 1, 1970, with student body integration to follow on September 1, 1970. In *Carter, supra,* the Supreme Court held that student integration was also required by February 1, 1970.

4. This court construed the *Carter* directive as requiring the integration of Starkville students by the first day of the 1970–1971 school year, or September 1, 1970. The decision in *Carter* was announced less than one month before the February 1, 1970, deadline imposed therein. Based on the time constraints, this court limited application of the *Carter* ruling to the school districts specifically named as defendants in the lawsuits. *See Montgomery v. Starkville Municipal Separate School District*, E.C. 69–37(A)–S, Bench Ruling dated February 3, 1970, at p. 33.

On June 30, 1969, the instant class action was filed on behalf of all black children attending school in the City of Starkville.[5] Plaintiffs alleged in their complaint that school officials were guilty of maintaining a dual educational system segregated on the basis of race and requested the court to order elimination of the dual system. Having received the mandate of the Court in *Alexander, supra,* and *Carter, supra,*[6] this court granted the plaintiffs permanent injunctive relief on February 4, 1970, and issued supplemental relief in an order dated November 29, 1971.

Prior to February 5, 1970, the Starkville school system consisted of one white high school, one white junior high school, two white elementary high schools, one black high school, one black middle school, and two black elementary schools. Student enrollment during the academic year 1969–1970 was 4,313, composed of approximately 53 percent white students and 47 percent black students. Teacher assignments also reflected racial segregation, as only one or two black teachers taught in white schools and twenty-three white teachers were assigned to teach in black schools. White principals were in charge of the white schools, and the black schools were administered by three black principals and one black "head teacher." *See generally, Armstead v. Starkville Municipal Separate School District,* 325 F.Supp. 560, 562 (N.D.Miss.1971), *affirmed in part and reversed in part,* 461 F.2d 276 (5th Cir.1972). As the court noted in 1971,

> [T]here has been a long history of racial discrimination by [the] defendants in the conduct of the Starkville Public School System. The School Board continued to operate a dual system of schools based on race long after *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1955), and failed to commence conversion to a unitary system until forced to do so by the orders of this court on February 5, 1970.

*Id.* at 569.

On February 5, 1970, this court ordered Starkville school officials to "immediately begin to operate a unitary school system as required by the Supreme Court...." This court also "permanently enjoined [school officials] from discriminating on the basis of race or color in the operation of the Starkville Municipal Separate School District school system ...," required them to "take affirmative action to disestablish all school segregation and to eliminate the effects of the dual school system ...," and prohibited them "from maintaining any classrooms or sections in any school building on a racially segregated basis."

As a result of this order, faculty and students were reassigned and desegregated. Facilities and educational programs were opened up to all students regardless of color, and desegregation in the Starkville schools commenced.

Approximately a year later, plaintiffs requested the court to grant additional injunctive relief by requiring school officials to file semi-annual[7] reports with the court concerning the placement and performance of students and teachers, broken down by race, and advising the court as to the degree of their continued compliance with the February 5, 1970, order. The court sustained plaintiffs' motion on November 29,

---

**5.** The suit filed initially was concerned with both Starkville city schools and Oktibbeha county schools. *Bell v. Starkville Municipal School District,* EC69–37–S. On August 6, 1969, the county and city claims were severed, and the two cases were given new styles. *Harris v. Oktibbeha County School District,* EC69–37–S; *Montgomery v. Starkville Municipal Separate School District,* EC69–37(A)–S. The latter case is the same case involved herein; however, a new docket number was assigned for administrative reasons.

**6.** Prior to the mandate in *Alexander, supra,* the Starkville school officials had begun to work toward eliminating the dual educational system. To this end, a Bi-Racial Advisory Committee was established, consisting of an equal number of black and white educators. The committee, which continues to exist, was set up to assist in preparing desegregation plans and methods of implementing them.

**7.** On September 10, 1986, the court entered an agreed order requiring school officials to file only annual reports commencing with the 1985–1986 school year.

1971, and awarded the supplemental relief requested.

Relatively few complaints were made by plaintiffs between the entry of the 1971 order and the year 1978. Although this court found in a separate but related lawsuit that Starkville school officials had practiced racial discrimination against black teachers by disproportionately denying them reemployment, additional relief was granted and the unlawful practices were terminated. *Armstead v. Starkville Municipal Separate School District*, 325 F.Supp. 560 (N.D.Miss.1971), *affirmed in part and reversed in part*, 461 F.2d 226 (5th Cir.1972); *Armstead v. Starkville Municipal Separate School District*, 395 F.Supp. 304 (N.D.Miss.1975); *Armstead v. Starkville Municipal Separate School District*, 331 F.Supp. 567 (N.D.Miss.1971). A motion to dissolve the injunctions and, by implication, to have the Starkville school system declared unitary was filed on July 18, 1978, but was voluntarily withdrawn three years later by the defendants upon receipt of a report by the Office of Civil Rights withholding complete approval of the system.

Plaintiff intervenors submitted their present request for relief to the court on March 24, 1983, alleging that the defendants had failed to desegregate their school system completely. After honing the issues through pretrial and status conferences, plaintiff intervenors alleged that the defendants:

(1) failed to prepare and file semi-annual reports with the court as required by the terms of the November 29, 1971, order;

(2) allowed inter-district transfers of students, which results in reduced desegregation, in violation of the terms of the February 5, 1970, order;

(3) failed to compensate black staff members on the same basis as their white counterparts;

(4) have dismissed or demoted black staff members on the basis of race and have refused to rehire former employees or hire new ones also on the basis of race;

(5) have discriminated against black school children by maintaining segregated classes, which is the result of the school's use of improper standarized tests to group the students according to achievement and ability;

(6) have discriminated against black school children by developing and implementing separate programs of remedial and gifted instruction on the basis of race.

The claims concerning failure to file semi-annual reports and inter-district transferring of students have been settled and these issues are moot and need not be considered. A trial was held September 29, 1986, on the remaining viable issues.

I. Unequal Compensation.

Starkville teachers are compensated in accordance with a salary schedule approved by the District Board of Trustees. The level of pay is determined by two factors: the level of formal training held by the teacher and the number of years experience he or she has as a teacher. The schedule does not list race as an apparent factor.

■ Plaintiff intervenors put on no evidence to show that the salary schedule is incorrect. Plaintiffs also fail to allege or establish a failure to follow the terms of the schedule in any specific instance. Plaintiffs have wholly failed to prove that black and white staff members receive unequal compensation. The court finds for defendants on this claim.

II. Unequal Employment.

A. Discharge or Demotion of Teachers Based on Race.

■ A demotion includes any reassignment (1) under which the staff member receives less pay or has less responsibility than under the assignment he held previously, (2) which requires a lesser degree of skill than did the assignment he held previously, or (3) under which the staff member is asked to teach a subject or grade other than one for which he is certified or for which he has had substantial experience within a reasonably current period. *Sin-*

gleton v. Jackson Municipal Separate School District, 419 F.2d 1211, 1218 (5th Cir.1970), cert. denied, 396 U.S. 1032, 90 S.Ct. 611, 24 L.Ed.2d 530 (1970) (Singleton III ). Depending upon the subject matter involved, five years may constitute a reasonable period. Id.

Teachers who are demoted or discharged form a pool from which the school officials should give priority in rehiring when openings appear in their previous job applications. Id. No staff vacancy may be filled through recruitment of a person of a race, color, or national origin different from that of the individual dismissed or demoted until the individual has had an opportunity to fill the vacancy and has failed to accept an offer to do so. Id.

■ In order to rebut the presumption that a discharged teacher is qualified to fill the type of position from which he was demoted or discharged, school officials must establish lack of qualification by objective and absolute criteria, free from racial considerations. School officials must also establish that the individual is unqualified without reference to other applicants, as well as explain how an individual who is unqualified was hired in the first place or how the individual, once qualified, later became unqualified under the circumstances. Id.

■ If a complainant can show a long history of discrimination in the community and a failure of school officials to desegregate until forced to do so, along with a disproportionate number of discharges of black teachers, an inference will arise that the discharges or demotions were racially motivated and impermissible. Baker v. Columbus Municipal Separate School District, 329 F.Supp. 706 (N.D.Miss.1971). The burden is then shifted to the school officials to show by clear and convincing evidence that the discharges or demotions were not racially motivated. Id. See generally, Comment, "Problems In Faculty Desegregation," 43 Miss.L.J. 363, 368–70 (1972).

From 1976 through 1984, only seven black employees were discharged by Starkville school officials. By comparison, thirty-five white employees were discharged during this period. The only demotion appears to have occurred in the 1983–84 school year and involved a white music teacher cut from full time to part time as part of a reduction in force plan.

Discharges of black employees may be listed as follows:

| Year | Position | Reason |
| --- | --- | --- |
| 1976–77 | Vo Tech | Insufficient number of students |
| 1981–82 | Janitor | Poor Conduct |
| | Unstated | Unstated |
| 1982–83 | Teacher | Reduction in force |
| 1983–84 | Guidance Counselor | Reduction in force |
| | Unstated | Reduction in force |
| | Chapter 1 Teacher | Reduction in force. |

■ There is no evidence in the record relating to the circumstances involved in each individual discharge. The court is unable to determine whether the above-listed positions have been permanently abolished or whether replacements have been employed on an improper basis. Plaintiff intervenors have failed to meet their burden of proof as to this claim, and the court shall deny relief accordingly.

**B. Independent Recruitment and Hiring of New Teachers Based on Race.**

School employees may be broken down into twelve categories: administrative officials, permanent full-time teachers, temporary full-time teachers, assistant teachers, part-time teachers, teacher aides, guidance counselors, office staff, service and maintenance staff, band directors, speech therapists, and bus drivers.

Since 1976, only one of the fifteen administrative officials hired has been black. No blacks have been hired as office clerical workers, service and maintenance workers, band directors, or speech therapists, although a total of thirty-seven positions were filled during this period, all by white applicants. Of the nineteen temporary teaching positions open since 1976, only one was filled by a black applicant. None of the part-time teachers retained since 1972 have been black.

In 1972, Starkville employed approximately one hundred forty-five teachers on a full-time basis. Approximately twenty-four percent of these were black. By 1986, the total number of faculty and staff had increased to over two hundred, but the overall percentage of blacks had decreased to twenty-one percent of the total employees.

Both plaintiff-intervenors and defendant school officials agree that the statistical evidence illustrates a problem which must be solved. The parties disagree, however, as to the cause of this problem.

School officials assert that their failure to hire more black staff members is caused by the lack of qualified minority teachers in the state.[8] Dr. Tom Saterfiel, Deputy Superintendent of Education of the State of Mississippi, confirmed the existence of this problem. He testified that a task force had been recently appointed by the State Department of Education to address the issue of the nonavailability of minority teachers for hiring in Mississippi. According to Dr. Saterfiel, the decline of the percentage of black faculty employed in Starkville paralleled the decline in the percentage of black teachers in the state as a whole. He also stated that only eleven percent of the teachers certified by his department in 1985 were black as compared to 1980–82 when seventeen percent of all new certificates were issued to blacks. In 1981–82,

the percentage of black teachers statewide was thirty-six percent and is now down to thirty-five percent. By comparison, in 1981–82, the percentage of black teachers in Starkville was twenty-two percent and has since declined to twenty-one percent. Dr. Saterfiel concluded by stating that the state average for minority faculty percentages is comparable to that found in the Starkville schools.

█ At the outset, the court is faced with the task of defining both the relevant labor market and the applicant pool. A statistically significant disparity between the racial composition of the individuals actually employed and those belonging to the applicant pool may create a prima facie case of discrimination in recruiting. *Castaneda v. Pickard*, 648 F.2d 989, 1003 (5th Cir.1981), *modified sub nom. Castaneda by Castaneda v. Pickard*, 781 F.2d 456 (5th Cir.1986).

The relevant labor market is the geographical area from which the Starkville School District might reasonably be expected to draw applicants and teachers. *Castaneda, supra.* Moreover, the relevant labor market must be defined separately for each position of employment or for positions with similar qualifications and duties since the market for teachers may be different from that for school administrators or clerical staff. *Hazelwood School District v. United States*, 433 U.S. 299, 308 n. 13, 97 S.Ct. 2736, 2742, n. 13, 53 L.Ed.2d 768 (1977).

In the case *sub judice*, plaintiff intervenors introduced no evidence for use in determining the relevant labor market(s) for the various positions available in the Starkville school system. The area from which the district's present employees have come is unknown.[9] Prior recruiting efforts for teachers are also unstated, although district representatives apparently consider graduates in Starkville and Jackson to be

---

8. It is reasonable to infer that the number of potential applicants has decreased to a certain extent as a result of competition from neighboring states capable of offering higher salaries to qualified blacks. *Cf. United States v. Corinth Municipal Separate School District*, 414 F.Supp. 1336, 1341 (N.D.Miss.1976).

9. The relevant work area would undoubtedly include the Starkville and Oktibbeha County area at a minimum. *Cf. United States v. Corinth Municipal Separate School District*, 414 F.Supp. 1336, 1341 (N.D.Miss.1976).

potential candidates for employment. Recruiting practices of other schools would be helpful in determining the relevant labor market(s), but evidence in this respect is likewise missing from the record.

The court is faced with a similar absence of evidence as to determining the appropriate applicant pools. Although the testimony of Dr. Saterfiel indicated that eleven percent of the teaching graduates certified in 1985 were black, the number of individuals involved was not stated. Moreover, the specific qualifications required for speech therapists, band directors, guidance counselors, and other positions are unknown, as is the number of corresponding available black applicants.[10]

■ Based on the foregoing, the court finds that the plaintiff intervenors have failed to show that the Starkville School Board is guilty of unlawful discrimination in recruiting.

### III. Grouping of Students For Instructive Purposes.

The Starkville School District has grouped its students for instructional purposes since 1965, prior to desegregating in 1970. Students are required to take an achievement test[11] once a year to determine how well they are learning the material taught in class. The test results are then used to place children in either the high, average, or low achievement groups set up for subjects involving skill mastery. Achievement grouping[12] is used only for elementary and junior high school students[13] and is limited in application to courses involving skill mastery, such as mathematics and language arts. Skill mastery is fundamentally important in mathematics and reading because these subjects must be mastered before a student can move on to other material. Simply stated, mathematics and language arts are "core" subjects which form the foundation for educational advancement. Skill mastery is not necessary in other subjects such as science, social studies, health, and physical education. A student may be "grouped" in different levels in each of these subjects, i.e., a lower level grouping on one does not automatically place the student in the lower level of the other subject. The grouping of students occurs during approximately forty percent of the school day. In the remaining sixty percent, the students are heterogeneously assigned to classes.

The student population in Starkville is roughly divided equally among blacks and whites. Concededly, a random distribution of students would find this ratio reflected in the classrooms. Under achievement grouping, however, classes involving skill mastery have a degree of racial identifica-

---

10. The order to desegregate does not require the state to provide minority-group students with teachers who are not competent. The state's duty to integrate its schools and to take affirmative action to eliminate the vestiges of discrimination would indeed be *violated* were it to thrust upon minority students, both as role models and as pedagogues, teachers whose basic knowledge and skills are inferior to those required of majority race teachers. *United States v. LULAC,* 793 F.2d 636, 643 (5th Cir.1986) (emphasis added).

11. The Stanford Achievement Test (SAT) was used in 1985 and 1986. Previously, the California Achievement Test (CAT) and the Comprehensive Test of Basic Skills (CTBS) were utilized.

12. Achievement grouping and ability grouping have been used interchangeably by the courts over the years, but represent separate and distinct concepts. Achievement testing and subsequent grouping is designed to measure a student's *present* performance and how proficient he has become in mastering certain skills. On the other hand, ability grouping is based upon IQ test results, as opposed to standardized achievement tests, and predicts a student's *future performance.*

Courts have likewise used the term "tracking" to represent any kind of homogeneous grouping of students, whether based on achievement or ability. *See Hart v. Community School Board of Ed., N.Y. Sch. Dist. #1,* 512 F.2d 37, 45 n. 11 (2nd Cir.1975) (achievement tracking); *Smuck v. Hobson,* 408 F.2d 175, 187 (D.C.Cir.1969) (ability tracking). The terms "mainstreaming" and "leveling" have consistently been used, however, to refer to heterogeneous, or mixed, pupil assignment plans.

13. In 1976, achievement grouping was ended for students in the ninth, tenth, eleventh, and twelfth grades. Later, defendants terminated grouping for grades seven and eight. Students in grades seven through twelve now select courses on a voluntary basis.

tion. Approximately eighty percent of the students in the "high achievement" group are white, and roughly eighty percent of the students in the "low achievement" group are black. The percentage of blacks in the "average achievement" group is comparable overall with that of whites.

■ If the results of achievement grouping are statistically abnormal, an inference of discrimination may be drawn. *Morales v. Shannon,* 516 F.2d 411, 414 (5th Cir. 1975), *cert. denied,* 423 U.S. 1034, 96 S.Ct. 566, 46 L.Ed.2d 408 (1975). In the case *sub judice,* white students constitute approximately fifty percent of the overall student population, but roughly eighty percent of the high achievement groups in the various grades.[14] Thus, 1.6 times as many whites are assigned to high achievement groups as are enrolled in the grades as a whole.

Courts have long wrestled with statistical showings in student grouping cases and have reached different results depending on the relative disparities of students assigned. In *Morales, supra,* a 1.5 disparity was held to be statistically normal and insufficient to support an inference of discrimination. In *Castaneda, supra,* 2.3, 2.4, and 2.6 ratios were held abnormal, and similar statistics were used to justify an inference of discrimination in *Moses v. Washington Parish School Board,* 330 F.Supp. 1340 (ED La.1971), affirmed, 456 F.2d 1285 (5th Cir.1972).

Dr. Carl O. Word, an expert in statistical analysis and evaluation, testified on behalf of the plaintiff intervenors and was of the opinion that the assignment of students in Starkville schools was "grotesquely abnormal" from a statistical standpoint.

Defendants contend they have explained the cause of this unusual distribution and assert that it is not the result of racial discrimination.[15]

■ The court therefore finds that the distribution of Starkville school children is abnormal and unusual with reference to racial characteristics and is sufficient to justify an inference of discrimination. The court also finds that the plaintiff intervenors have presented a prima facie case of disparate impact, subject to the tender of proof from the defendants to rebut the same.

Achievement grouping has long been challenged by minority students as discriminatory due to its segregative effect. As early as 1971, school officials in Starkville were notified by the local chapter of the NAACP that a number of complaints had been received over the achievement grouping issue. In 1979, the NAACP filed a formal complaint with the Office of Civil Rights (OCR) alleging that student grouping practices in Starkville schools were being impermissibly used to maintain a dual educational system.

At the time the OCR complaint was filed, student placement was based on three things: achievement test scores, teacher recommendations, and guidance counselor recommendations. After meeting with school officials, the OCR issued a report and recommended a number of changes. First, OCR recommended that student placement be based on completely objective data such as test scores. To this end, school officials complied by ending teacher and guidance counselor input into the grouping process. Second, OCR suggested that students be given the opportunity to be retested upon request by either themselves or school officials on a frequent

---

14. The percentage of blacks in the low achievement groups was also high, approaching eighty percent in many classes. Moreover, specific classes often exhibited a greater racial polarization. For example, in 1981–82, 89.4 percent of Level III students in Ward Elementary were black, while 85.9 percent of Level I students were white. In the same years, 90.7 percent of the students in Sudduth Elementary Level III classes were black, and 87.9 percent of Level I students were white.

15. The courts have held that official action which has the *effect* of perpetuating or reestablishing a dual school system violates the duty on the part of school officials to desegregate. *Pitts v. Freeman,* 755 F.2d 1423, 1427 (11th Cir.1985) (emphasis in original). Hence, the defendants are not held to an intentional discrimination standard in this context, since formal unitary status has not yet been achieved. *Cf. Georgia State Conference of Branches of NAACP v. State of Georgia,* 775 F.2d 1403 (11th Cir.1985).

basis if the results of an initial test were doubted for some reason. This too was accepted and implemented by district officials. Third, OCR recommended that a separate curriculum be devised to assist the students in the lower level to understand the materials in a better fashion. Starkville representatives approved of this idea as well. Finally, OCR suggested that teachers be given training in remedial work, and school officials accepted this as well. The suggestions of OCR were implemented by the defendant school district.

In September of 1982, the OCR cleared Starkville of all charges brought by the NAACP. Although the OCR did not expressly approve of homogeneous grouping, it also declined to require heterogeneous grouping. OCR further declined to recommend the rejection or adoption of any specific tests, such as the CAT, WISC–R, or SAT.

 Achievement grouping is not invalid *per se* and may be used where there is no racially discriminatory effect. *McNeal v. Tate County School District*, 508 F.2d 1017 (5th Cir.1975). If achievement grouping does cause segregation, it is still permissible in an otherwise unitary school system [16] if the school district can demonstrate that the classroom assignment method is (i) not based on the present results of past segregation or (ii) will remedy such results through better educational opportunities. *Id.*

 If the school district has not been formally declared fully unitary or has a recent history of unlawful discrimination and is in the process of converting to a unitary school system, it is subject to a higher degree of judicial scrutiny. *Castaneda v. Pickard, supra.* Under these circumstances, school districts are prohibited from employing achievement grouping as a device for assigning students to schools or classrooms. *Id. See generally United States v. Gadsden County School District*, 572 F.2d 1049 (5th Cir.1978); *Morales v. Shannon*, 516 F.2d 411, 414 (5th Cir.1975); *Moses v. Washington Parish School Board*, 330 F.Supp. 1340 (E.D.La. 1971), *affirmed*, 456 F.2d 1285 (5th Cir. 1972); *Lemon v. Bossier Parish School Board*, 444 F.2d 1400, 1401 (5th Cir.1971); *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211, 1219 (5th Cir.1969), *cert. denied*, 396 U.S. 1032, 90 S.Ct. 611, 24 L.Ed.2d 530 (1970) (*Singleton III*).

An important distinction should be noted at this juncture. A school district which has not operated a segregated school system as proscribed by *Green, supra,* for a period of years is "unitary" in the sense which permits the use of achievement grouping under certain circumstances. *Georgia State Conference of Branches of NAACP v. State of Georgia*, 775 F.2d 1403, 1413–1414 (11th Cir.1985).

Defendants do not specifically seek to have their school district formally declared "unitary" in this proceeding. Nevertheless, it is clear that Starkville has operated a de facto unitary school system since 1970–71 and will be entitled to continue present grouping practices if they are not based on the present results of past discrimination or if they remedy such results through better educational opportunities. *McNeal, supra,* at 1020; *Georgia State*

16. Legal scholars (and, by implication, school officials) have long been frustrated by the inability of courts to adequately define what is meant by a "unitary" school system. Although the court declines at the present time to take on this monumental task, a few observations will be made.

A school system which is not desegregated is clearly not unitary. Once a school district implements a desegregation order, pursuant to the mandate in *Brown* and its progeny, it may be referred to as "unitary" or "de facto unitary." A school system is not fully unitary, however, until it receives a formal declaration to that effect; until such is granted, it must continually work towards the elimination of "all vestiges of past discrimination." Plaintiffs, both students and parents, are faced with the easier task of showing discriminatory *effects* of a challenged pedagogical practice or procedure at this stage. Once a school system is declared fully unitary, however, plaintiffs must show that officials intended to discriminate against students, and that such discrimination actually resulted. *See generally* Note, "Allocating the Burden of Proof After A Finding of Unitariness in School Desegregation Litigation," 100 Harv.L.Rev. 653 (1987).

*Conference of Branches of NAACP v. State of Georgia, supra.*

Evidence that a district implemented a discriminatory assignment method at the time of desegregation justifies a court in finding that the school officials are attempting to continue to preserve the status quo in contravention of the law. *Gadsden County, supra,* at 1052. As noted before, however, grouping of students for instructional purposes was instituted by Starkville school officials many years prior to 1970.

Evidence that minority students are not "locked into" their achievement groups, but instead are likely to move upward and improve over the years, is sufficient to meet the second prong of the *McNeal* test. Although the district failed to maintain student mobility statistics according to race, the progress of students over the years may be determined by reference to information contained in the biannual reports on file with the court as well as the testimony of school administrators introduced at trial.

One way to obtain a perspective of student mobility is to track members of a class chronologically. First graders in 1979–80 attended Overstreet Elementary School. Of the roughly 274 students in this "Class of 1991," 61 were assigned to Level III for reading, 58 of whom were also in the Level III math classes. Upon entering the second grade in 1980–81, 14 reading Level III students moved to either Level II or Level I. When taking into consideration the 10 students who went down in their test scores to such an extent to warrant their placement in Level III, the reading class was subject to a mere reduction of 4 students, down to 57. The Level III math class fared better, as 42 students moved upward and only 3 students moved downward, creating a new student total of 19. In 1982–83, when this group entered the fourth grade, the totals were reduced even more, as the total number of Level III

students was now 48. In 1983–84, Level III students numbered 41 upon entry into the fifth grade. Of these 41, however, 11 were students who had dropped downward from Level II the previous year. Upon entry into the sixth grade in 1984–85, the last grade in which achievement grouping was practiced, Level III students decreased to 36 in number. Hence, the total number of Level III students went from 61 to 36, a reduction of forty-one percent.

Although the racial composition of the mobile students is not known, school records indicate that the low level remained predominently black. In 1982–83, 44 of the 48 Level III students were black, and in 1983–84, 35 of the 41 students in this group were black. By 1984–85, the total number of students was reduced to 36, 33 of which were black.

Greater upward mobility is reflected in the performance of a second sample group. In 1981–82, 160 students entered the first grade in Overstreet Elementary school. This "Class of 1993" contained 101 students in its initial Level III group, 77 of whom were black. By 1982–83, this had declined to a total of 70 students, 58 of whom were black. By the following year, the total had dwindled down to a total of 55 students, 44 of whom were black. Thus, a 57 percent reduction of the overall student total in Level III is noted, including a forty-three percent reduction in the black population.

A review of the testimony from various teachers and school administrators reveals that reasonable minds differ as to whether children in Starkville are benefited by achievement grouping.[17]

Dr. Harold E. Dent, a clinical psychologist, testified on behalf of the plaintiff intervenors that achievement grouping in his opinion was detrimental to the self-image of students placed in the "low achievement" groups and impeded both their de-

---

17. This ongoing debate has been recognized by the Fifth Circuit over the years, prompting the appellate court to issue the following admonition: "The merits of a program which places students in classrooms with others perceived to have similar abilities are hotly debated by educators; *nevertheless, it is educators, rather than* *courts, who are in a better position ultimately to resolve the question whether such a practice is, on the whole, more beneficial than detrimental to the students involved." Castaneda, supra,* at 996 (emphasis added). *See also Gadsden County, supra,* at 1052; *Morales, supra,* at 414; *McNeal, supra,* at 1020.

sire and ability to learn. Dr. Dent stated that standardized achievement tests are primarily designed to measure improvement in group performance and should not be used to calculate an individual's performance. He concluded that achievement grouping is completely without merit and further stated that it "cripples" students. Notably, Dr. Dent is a psychologist—not an educator.

Dr. Robert Garvue, an educational consultant and formerly the superintendent of Starkville schools in 1984-85, concurred with Dr. Dent's belief that achievement grouping is harmful to the students. Dr. Garvue testified that Level III class instruction failed to adequately prepare students for basic high school courses such as algebra and probably caused a high dropout rate for black children who felt that it would be educationally useless to proceed beyond the eighth grade. Dr. Garvue ended by stating that achievement grouping was, in his opinion, an example of "child abuse." The qualifications of Dr. Garvue as an expert in ability grouping are suspect. He has had extensive experience in school finance. His opinion on grouping was admittedly based on reading of text materials on the subject. He has not been an on-line school administrator for over twenty years with the exception of his one-year interim term with the defendant school system.

Dr. Cynthia A. Ward, formerly an administrative assistant with the Starkville Schools and presently the assistant director of Planning and Policy for the Mississippi State Department of education, was responsible in 1983-84 for the development of the curriculum in the district. She testified the standardized tests (CTBS, CAT) adequately tested material taught in the schools and yielded information about individual student performance that equipped instructional personnel to be able to determine the needs of the students and to provide adequate instruction in that area. Dr. Ward's testimony indicated that there was meaningful upward mobility of the lower level students.

Dr. Nolan Vickers, formerly a Starkville school principal and superintendent from 1965 to 1984, testified that when Starkville was desegregated in 1970, a Bi-Racial Advisory Committee was formed which approved the achievement grouping system then in place in the district. He noted the OCR did not disapprove the grouping system when it was considering the NAACP complaint filed in 1979. In his opinion, one benefit of achievement grouping was to help students decrease the amount of time they needed to accomplish a task involving skill mastery. In addition to improving a student's "time on task," Dr. Vickers believes that achievement grouping results in measurable student mobility from Level III to Levels II or I.

Dr. Vickers candidly stated that the use of norm-based standardized test results as the only criteria for grouping students into achievement levels is not the best way to measure an individual student's progress. Notably, it was at the insistence of the Office of Civil Rights that other grouping criteria was eliminated by the defendant school district. Nevertheless, in conjunction with the provision for retesting students and efforts made in specialty structuring the instructional program used in Level III, achievement grouping was educationally sound in the opinion of Dr. Vickers.

Conceding that Level III classes remain predominently black throughout the district even as students are advancing in grade levels, Dr. Vickers testified this was due, in part, to parents of white children who withdrew their children from the public schools and placed them in private academies after receiving notification they had been assigned to a low achievement group.

Dr. Vickers contested the assertion that the performance of Level III students is hindered by poor self-esteem allegedly resulting from being placed in a low achievement group and labeled "dumb" by fellow classmates. He felt that the support a child receives at home, adequate instruction, adequate environment in school and classes, adequate learning tools, and self-concept are all important to a child's per-

formance. Achievement grouping alone cannot be pinpointed as a cause for poor performance.

A qualified and experienced educator, Dr. Vickers testified that the Starkville Public Schools were using some form of grouping for instruction when he graduated from the Starkville High School in 1957. He further testified that some form of grouping was utilized in the Starkville Public Schools between 1965 and 1970, the year in which this court ordered the Starkville Public Schools to operate a unitary school system. Immediately after the abolition of the dual school system in 1970, achievement grouping of students was employed in all subjects throughout the school day with the approval of a biracial committee. Dr. Vickers stated that once a child was assigned to a certain achievement group, he stayed in that group for all subjects during the school day. He testified that the school district made a change in that policy during the 1975–76 school year. In that year, achievement grouping of students was limited to grades one through seven and only in those subjects requiring skill mastery: language arts and mathematics. For other subjects—science, social studies, health, and physical education—the students were heterogeneously grouped. That is, they were grouped at random.

This grouping system, which relied upon achievement test scores, teacher, and counselor recommendations for assignment to achievement level, persisted until the school district received a notice from the Office of Civil Rights advising that a complaint had been initiated against it by the Oktibbeha County Chapter of the NAACP. Vickers negotiated with the Office of Civil Rights personnel and, pursuant to an agreement made with OCR, the school district assigned children to achievement levels in grades one through six in mathematics and language arts based solely on an objective criterion—the achievement test scores. The test used by the school district at that time was the California Achievement Test. This method of testing was approved by the OCR as the sole, objective criterion by which to group students for instruction. The school district currently uses the Stanford Achievement Test for the purpose of assignment of students to achievement groups.

Dr. Vickers testified that the administrative staff of the Starkville Public Schools determined that mathematics and language arts were the two areas in which elementary school students should be grouped because these subjects require skill mastery. As explained by Dr. Vickers, a student must master certain skills in reading and mathematics before moving on to other material. He indicated that skill mastery was not necessary in other subjects, such as science, social studies, health, and physical education.

In reading and mathematics, students are placed in one of three levels: Level I, Level II, or Level III. Level I students demonstrate by test scores the highest achievement or understanding of past educational pursuits, while Level III students demonstrate by test scores the lowest achievement or understanding of past educational pursuits. Students in grades one through six are assigned to the appropriate achievement level based solely on the student's performance on the standard achievement tests (the Comprehensive Test of Basic Skills from 1970 to 1972, and the California Achievement Test thereafter up until the 1985–86 school year).

Dr. Vickers testified that he preferred the assignment method used by the Starkville Public Schools prior to the OCR complaint: the assignment based upon the student's score on the California Achievement Test (using a standard error of measure), supplemented by teacher recommendation and counselor input. It was at the request of OCR that the school district adopted the California Achievement Test score as the sole, objective assignment method of students. Dr. Vickers testified that, because the school district could no longer use input from teachers and counselors, nor could it use the standard deviation in test scores, a policy was implemented whereby a student could be retested and reassigned to a different achievement level if it appeared to the teacher, the principal, or the parents that the child had been initially misplaced

by virtue of the California Achievement Test score. This policy is presently in use in the defendant school district.

Dr. Vickers testified that students remained in achievement level groups for approximately forty percent of the school day in grades one through six. For the remainder of the school day, the children in grades one through six are randomly grouped. That is, children of all achievement levels are to be found in each science, social studies, health, and physical education classes. He testified that the district uses what he termed the open-classroom concept in the elementary grades. The walls between two or three adjacent classrooms have been removed, making one large unit, each unit in the school accommodating sixty to ninety students at one time. During the course of the school day, the sixty to ninety students within each open-classroom unit are grouped for language arts and mathematics, but are not grouped for other subjects. During that portion of the school day (forty percent) in which students in grades one through six are grouped in achievement levels, the Level III classes are predominately black. During the remaining portion of the school day (sixty percent), the racial distribution of the classes resembles the racial distribution of the school district as a whole: approximately fifty percent black and fifty percent white.

Dr. Vickers testified that teachers of Level III classes were given special in-service training and used a curriculum specially tailored to the needs of Level III students, which curriculum was developed with the assistance of a federal grant.

Finally, Dr. Vickers testified that students are not grouped above the sixth grade. Thereafter, students are allowed, in conjunction with their parents, to choose the courses which they take. No forced grouping of any kind occurs in the upper grades of the Starkville Public Schools.

The court was impressed with the testimony of Dr. Vickers regarding his concern as to whether or not the grouping policy utilized by the defendant school district resulted in segregation within the school.

In 1972–73, he visited other schools within the state and subsequently began to utilize his large classroom concept and narrowed the achievement grouping to those subjects requiring skill mastery: reading and mathematics.

Defendants' final witness, Dr. Thomas Saterfiel, has excellent educational credentials. He has taught statistics, program evaluation, research design and testing on the college level. Dr. Saterfiel testified that while grouping of students according to achievement tests is sound, the statewide trend is moving toward the utilization of criterion-based test results which more accurately measure what is taught. However, he testified that the problem is not grouping—it is a failure to recognize and offer remedial work—the real burden is on the teacher. In other words, achievement grouping is needed to identify children who need specific help. His testimony indicated that even if a school district goes to heterogeneous grouping, the children are nevertheless grouped according to their achievement level and needs. He said grouping is necessary in education because it allows identification and remediation of those students who need assistance. He unequivocally testified that grouping, as utilized in the Starkville School District, is consistently used to advance the children in significant numbers to a higher level.

Dr. Saterfiel, who is the Deputy Superintendent of Education of the Mississippi Department of Education, stated that black children dominate in Level III classes not because of race, but because of the impact their present home environment and socioeconomic status has on their ability to learn. He stated that achievement grouping is not *per se* good or bad and that individual teachers make a major difference. Another important factor, according to Dr. Saterfiel, is whether a child's parents read to him at home. Since Mississippi has the highest rate of illiteracy among adults in the nation, more children in the state are deprived of home educational opportunities. These children need remedial education at the earliest opportunity in their educational experience.

**502**

Realistically, grouping in the Starkville Schools has a minimal segregative effect. It is applied to only one-half the student population, i.e., grades one through 6; it occurs for approximately forty percent of the school day; and the middle level (Level II) of these classes is unaffected. This minimal segregative effect is outweighed by better educational opportunities afforded the students.

 Based on the evidence presented, the court finds that a meaningful number of students are moving upward from Level III to Levels II or I or are learning more and understanding the basic course materials better as reflected by increasing test scores. Clearly, the defendants employ achievement grouping for the purpose of assisting the students' ability to learn and not as a way to maintain a dual system of education. Although the Starkville school system has a history of discrimination, it is in fact history and not present racial discrimination. This school district has been desegregated for almost sixteen years. The court must conclude that the defendants are not guilty of unlawful discrimination, and the use of achievement grouping is not proscribed as a matter of law.

Although achievement grouping, as used in the Starkville Schools, passes muster, the evidence reveals that teacher and counselor input together with meaningful retesting and reconsideration procedures may provide a better safeguard against improper placement of students. The school district may elect to implement this procedure.

The court finds from clear and convincing evidence that despite a history of discrimination, the Starkville School System has achieved and maintained unitary status for a sufficient period of time so that any racially disparate impact of grouping does not reflect the effects of past segregation or a contemporary segregative intent. Plaintiffs' challenge to defendants' grouping practice must fail.

In summary, achievement grouping is applied to only one-half the student population, i.e., grades one through six; it occurs for only an approximate forty percent of the school day, and it results in homoge-

neous grouping of two-thirds of a class. (Level II reflects the overall school population of fifty percent white and fifty percent black students.)

IV. Remedial and Gifted Educational Programs.

Plaintiff intervenors allege that school officials have maintained racially segregated educational programs through the use of testing and other selection procedures which place a disproportionate number of black children in remedial programs and result in gifted programs which are predominantly white.

Starkville schools offer five remedial education programs. They are (1) the Educably Mentally Retarded Program (EMR); (2) the Trainably Mentally Retarded Program (TMR); (3) the Chapter I Assistance Program; (4) the Serious Learning Disability Program (SLD); and (5) the Speech Therapy Program.

In their Application for Relief, plaintiff intervenors alleged, *inter alia,* that minority students were being disproportionately placed in the EMR, TMR, and Chapter I Programs because of their race. Although these issues were the subject of pretrial discovery requests and summary judgment motions, they were not included in the pretrial order and were apparently abandoned by the plaintiff intervenors prior to trial. The court, therefore, will decline to address these issues in a substantive fashion.

The district also offers gifted and exceptional students the opportunity to apply for entry into two programs, PEAK and VIVA. PEAK is designed to assist students of above-average intelligence, while the VIVA program is designed to serve students whose abilities are generally creative in nature and not measurable by scholastic performance. Both PEAK and VIVA are available to children in grades four through nine.

To be eligible for entry into PEAK, a student must successfully take two tests. First, he is required to score in the top ten percent of the Stanford Achievement Test

(SAT).[18] If he does this, then he must then achieve a high score on the Wechsler Intelligence Scale for Children, Revised (WISC–R) Intelligence Test. A student who does well on both tests will be offered the opportunity to enter the PEAK program.

■ The statistical evidence shows that white students are placed in the PEAK program at a substantially higher rate than black students. As the yearly breakdowns illustrate, less than five black students were able to enter PEAK in the years 1979–1984.[19] Although the court notes a modest increase in these numbers more recently,[20] the proof remains sufficient to justify an inference of discrimination in student selection for PEAK classes.

■ Once the plaintiff intervenors have made out a prima facie case of discrimination, the burden then shifts to the defendant school officials to rebut the same by clear and convincing evidence. The court is of the opinion that the defendants have not met their burden herein.

It has generally been known since at least the 1920's that black children score lower than white children on standardized intelligence tests of the kind developed earlier in the century. *See Parents In Action on Special Education (PASE) v. Hannon,* 506 F.Supp. 831, 835 (N.D.Ill.1980); *Larry P. v. Riles,* 495 F.Supp. 926, 954 (N.D.Cal. 1979), *affirmed in part and reversed in part on other grounds,* 793 F.2d 969 (9th Cir.1984). Black children score, on the average, one standard deviation lower than white children, which amounts to approximately fifteen points. *Id.; cf. Columbus Board of Education v. Penick,* 443 U.S. 449, 511 n. 17, 99 S.Ct. 2941, 2964 n. 17, 61 L.Ed.2d 666 (1979) (Rehnquist, J., dissenting).

As may be inferred from its name, the WISC–R is a revised version of a previous test, the WISC. The WISC test was first published in 1949, after having been standardized on 2,200 children, reflecting demographics derived from the 1940 census sta-

---

**18.** Formerly applicants for the PEAK program were required to take the California Achievement Test (CAT), but this has subsequently been replaced by the Stanford Achievement Test (SAT).

**19.** Students were placed in PEAK as follows:

| Year | School | Grade(s) | Black | White | |
|---|---|---|---|---|---|
| 1979–80 | Armstrong | 6,7 | 2 | 21 | |
| | Henderson | 6,9 | 0 | 24 | |
| | | | 2 | 45 | Totals |
| 1980–81 | Ward | 4 | 0 | 11 | |
| | Sudduth | 5 | 0 | 11 | |
| | Armstrong | 6,7 | 1 | 11 | |
| | Henderson | 8,9 | 0 | 9 | |
| | | | 1 | 42 | Totals |
| 1981–82 | Ward | 4 | 0 | 7 | |
| | Sudduth | 5 | 0 | 19 | |
| | Armstrong | 6,7 | 0 | 14 | |
| | Henderson | 8,9 | 1 | 21 | |
| | | | 1 | 61 | Totals |
| 1982–83 | Ward | 4 | 0 | 13 | |
| | Sudduth | 5 | 0 | 11 | |
| | Armstrong | 6,7 | 0 | 42 | |
| | Henderson | 8,9 | 0 | 26 | |
| | | | 0 | 92 | Totals |
| 1983–84 | Ward | 4 | 0 | 15 | |
| | Sudduth | 5 | 0 | 17 | |
| | Armstrong | 6,7 | 0 | 39 | |
| | Henderson | 8,9 | 0 | 27 | |
| | | | 0 | 98 | Totals |

---

**20.** In the year 1985–86, five minority students were eligible for PEAK and four entered. In 1986–87, six minority students were eligible, but

tistics. Only white children were among the 2,200 examined, however. *See Parents in Action on Special Education (PASE) v. Hannon,* 506 F.Supp. 831, 849 (N.D.Ill. 1980).

The WISC–R was administered for the first time in 1970 to 2,200 children, ages 6½ to 16½. Of the 2,200 tested, 305 minority students (15%) were included. The 2,200 children were chosen to reflect the population breakdown as reflected in the most current census report issued in 1970. *Id.*

Dr. Mary Shelton is administrator of federal projects with the defendant school system. She possesses a Ph.D. in education psychology and has extensive experience in the field of special education. She explained that the WISC–R test is administered to students as a final qualification criteria for their entrance into the PEAK program. This test was revised in 1978 to remove any racial or cultural bias, according to Dr. Shelton, and the test now reputedly represents state of the art norming according to the Burroughs Mental Measurement Yearbook, considered to be the "Bible" of testing.

According to Dr. Shelton, the PEAK program was instituted in 1980 in consultation with a biracial committee which has been involved in its administration. Through the first several years of this program, black students were totally absent therefrom. Dr. Shelton testified she became aware of this problem and in consultation with the superintendent of schools and the State Department of Education, revised the entrance requirements which resulted in a limited degree of minority student participation for the Years 1985 through 1987.

The PEAK program for intellectually gifted children is administered by virtue of a grant from the Mississippi State Department of Education. This state agency must approve a school district's plan for administering the program and the testing requirements for students' eligibility. As indicated above, the court is of the opinion that the defendants have not met their burden of rebutting by clear and convincing evidence the prima facie case of discrimination found by the court in the administration of the PEAK program. Progress has been made in admitting increasing numbers of minority students in recent years. Defendants' efforts in this regard are laudable, but additional effort must be made to create eligibility for a more representative number of minority students in the PEAK program.

■ In the hope that this innovative program may be continued under constitutionally permissible guidelines, the defendant school district will be ordered to confer with the State Department of Education and the Biracial Advisory Committee in an attempt to reformulate entrance requirement procedures for students to enter the PEAK program. Upon formulation of this plan, the school district will submit it to this court for approval. Plaintiffs will be afforded an opportunity to present any objections thereto.

Students in Starkville who are gifted creatively are offered the opportunity to participate in the VIVA program. In order for a student to be chosen, he must first be nominated. Nominations may come from a teacher, a principal, a parent, a peer, or the student himself. Once the nomination has been made, the student's work in the areas of art, creative writing, or dramatics is collected and with parental permission is submitted to a panel of judges for an eligibility rating. The audition panel is composed of educators and professionals who are not employed by the school district, and the panel is unaware of a student's name, his race, and his grades when judging his submissions. Guidelines for judging of material have been provided by the district and the State Department of Education.

When a student is ruled eligible by the audition panel, his work is then taken to a biracial Local Survey Committee for further review and, if approved, then submitted to the State Department of Education Regional Screening Team for final action.

The VIVA program has since proven to be quite popular. When initially set up,

the number who actually entered the program was unknown at the time of trial.

only one teacher was assigned to the program. At the present time, four teachers are involved in VIVA.

In the 1985–86 school year, twenty-four minority students were selected by teachers for entry into VIVA. In 1986–87, this number increased to thirty-six. All minority children selected for VIVA have chosen to participate.

To determine whether selection of students for the VIVA program is discriminatory, the total number of students who have participated over the years must be considered as well as the racial composition of these classes.

The statistical evidence shows that white students also participate in VIVA at a higher rate than black students. In 1980–81, one out of thirty-eight students in VIVA was black. In 1981–82, this increased to five out of eight-five and reached a high of ten out of one hundred twenty-nine in 1982–83. By 1983–84, only six black students were enrolled out of a total of one hundred thirteen.[21]

■ The crucial statistic for purposes of determining whether VIVA is discriminatory is the number of black students who were nominated but not accepted for entry into the program. When viewed from this perspective, VIVA appears to be nondiscriminatory.

Dr. Mary Shelton supervises the VIVA and PEAK programs. She testified that all twenty-four of the minority students who were eligible for VIVA in the 1985–86 school year actually participated in the program. In 1986–87, the number of minority students eligible for VIVA jumped to thirty-six and all participated. As compared with the number of minority students in previous years, the level of minority participation seems to have increased recently.

There is no evidence as to the number of white students who were nominated for VIVA but subsequently rejected. Likewise, the number of black students in the same category is available only for the last two years. Although blacks constitute a substantially smaller percentage of students in VIVA, the court finds that the plaintiffs have failed to prove that the program is either discriminatory or has been administered in an unfair manner. The court shall deny plaintiffs relief concerning the VIVA program.

We summarize our findings as follows:

1. Issues (1) and (2) pertaining to reports to the court and interdistrict transfers have been settled, and these issues are moot.

2. Issues (3), (4), and (5) are resolved in favor of the defendants.

21. Students were placed in VIVA as follows:

| Year | | | | |
|------|------|-----|-----|-----|
| 1980–81 | Ward | 4 | 0 | 4 |
| | Sudduth | 5 | 1 | 10 |
| | Armstrong | 6,7 | 0 | 23 |
| | Henderson | 8,9 | 1 | 37 |
| 1981–82 | Ward | 4 | 0 | 12 |
| | Sudduth | 5 | 1 | 14 |
| | Armstrong | 6,7 | 2 | 28 |
| | Henderson | 8,9 | 2 | 26 |
| | | | 5 | 80 |
| 1982–83 | Ward | 4 | 2 | 16 |
| | Sudduth | 5 | 1 | 19 |
| | Armstrong | 6,7 | 6 | 44 |
| | Henderson | 8,9 | 1 | 40 |
| | | | 10 | 119 |
| 1983–84 | Ward | 4 | 1 | 16 |
| | Sudduth | 5 | 1 | 24 |
| | Armstrong | 6,7 | 3 | 41 |
| | Henderson | 8,9 | 1 | 26 |
| | | | 6 | 107 |

3. Issue (6) is resolved in favor of defendants with the exception of the PEAK program wherein defendants must create greater eligibility for minority students.

Let an appropriate order issue.

### ORDER

Pursuant to a Memorandum Opinion this day rendered, the court finds and hereby enters judgment for defendants on all claims considered herein with the exception of the discrimination claim involving the PEAK program.

Defendants are ordered to revise the entrance requirements for the PEAK program in consultation with the Mississippi Department of Education and the Biracial Advisory Committee so as to provide additional minority eligibility. This plan shall be submitted to the court for approval with plaintiffs being afforded an opportunity to present any objections thereto.

SO ORDERED this 6th day of June, 1987.